# EXHIBIT A

**LATHAM&WATKINS**LLP

Two Freedom Square
11955 Freedom Drive, Suite 500
Reston, VA 20190-5651
Tel: (703) 456-1000  Fax: (703) 456-1001
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Boston | New York |
| Brussels | Northern Virginia |
| Chicago | Orange County |
| Frankfurt | Paris |
| Hamburg | San Diego |
| Hong Kong | San Francisco |
| London | Shanghai |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| New Jersey | Washington, D.C. |

File No. 024798-0076

December 10, 2005

**VIA FACSIMILE**

Stephen E. Jenkins
Ashby & Geddes
222 Delaware Avenue – 17th Floor
Wilmington, DE 19899

Re:   *Bally Total Fitness Holding Corporation v. Liberation Investments, L.P.,*
       No. 05-841-JJF

Dear Steve:

        We have reviewed the December 8, 2005 proxy statement filed by Emanuel Pearlman,
Liberation Investments, L.P, Liberation Investments Ltd., Liberation Investment Group, LLC
and Gregg Frankel.  Despite the fact that Bally has detailed in its court filings the material
omissions and misrepresentations made by Defendants in their prior SEC filings, Defendants
have failed to make any substantive corrections in their most recent filing.  Specifically,
Defendants continue to fail to disclose to Bally's shareholders the following:

- Pearlman's close personal and professional association with Bally's former
  management team, including Lee Hillman;

- Hillman's and The Lee S. Hillman Revocable Trust's investment in and advisory
  role with respect to the Liberation entities;

- Pearlman's status as an employee consultant to Bally and part of the management
  team led by Hillman (as opposed to merely being an "advisor" as the proxy
  statement currently states);

- The fact that Bally's Audit Committee concluded that the financial statements
  issued by Bally during Hillman's tenure were required to be restated and that the
  errors therein were a direct result of the "culture . . . that encouraged aggressive
  accounting" that existed under Hillman's leadership;

- Defendants' motives for the Stockholder Proposal, including Defendants' desires

   o  to displace current management,

LATHAM&WATKINS LLP

      o  to make it appear that current management is to blame for the accounting errors leading to the Company's restatements,

      o  to deflect attention from the fact that an independent investigation found Hillman and former management responsible for the "culture … that encouraged aggressive accounting" that led to those errors,

      o  to prevent current management from taking action against Hillman, and

      o  to retaliate against current management for the Audit Committee's independent investigation;

- The fact that at the time that Defendants sought redemption of Bally's Stockholder Rights Plan, and disclaimed any present intention to purchase additional stock, they in fact intended to purchase additional shares, as evidenced by their subsequent purchases which more than doubled their holdings;

- The fact that Defendants intended by accumulating shares in excess of ten percent of the total outstanding shares at Bally, to trigger the vesting of shares of restricted stock granted to Pearlman and others under the Company's Long Term Investment Plan;

- Defendants, Hillman and Pardus are working in concert in order to elect Pardus' slate of proposed directors, including Kornstein;

- The fact that Kornstein has long been affiliated with Pearlman; and

- Pearlman's involvement in other proxy contests where he nominated Hillman and Kornstein to his proposed insurgent slate, his involvement in prior corporate takeover attempts, his history of using proxy contests to force a company to either accede to his demands or face replacement of their management and boards, and his being sued in connection with such actions for not stating his true intentions in disclosures required by the SEC.

As we have noted in our court papers, Defendants' continued failure to disclose these items violates Sections 13(d) and 14(a) of the Securities Exchange Act of 1934.

Very truly yours,

*Laurie B. Smilan*

Laurie B. Smilan

# EXHIBIT B

PRRN14A 1 dprrn14a.htm REVISED PRELIMINARY PROXY STATEMENT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant ☐                    Filed by a Party other than the Registrant ☒

Check the appropriate box:

☒  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission only (as permitted by rule 14a-6(e)(2))**
☐  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to ss. 240.14 a-11(c) or ss.240.14a-12

## BALLY TOTAL FITNESS HOLDING CORPORATION
###### (Name of Registrant as Specified in Its Charter)

## Liberation Investments, L.P.

## Liberation Investments Ltd.

## Liberation Investment Group, LLC

## Mr. Emanuel R. Pearlman

## Mr. Gregg E. Frankel
###### (Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  1)   Title of each class of securities to which transaction applies:

  _____

  2)   Aggregate number of securities to which transaction applies:

  _____

  3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

  _____

  4)   Proposed maximum aggregate value of the transaction:

  _____

\* \* \*

Except as set forth in this Proxy Statement (including the Schedules and Appendices hereto), none of Liberation Investments, L.P., Liberation Investments Ltd., Liberation Investment Group LLC, Mr. Pearlman, Mr. Frankel nor any of their respective affiliates or associates, directly or indirectly:

- beneficially owns any shares of Common Stock of the Company or any securities of any parent or subsidiary of the Company;

- has had any relationship with the Company in any capacity other than as a stockholder;

- has been a party to any transaction, or series of similar transactions, since January 1, 2003, nor is any currently proposed transaction known to any of them, or series of similar transactions, to which the Company or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of them or their respective affiliates or associates had, or will have, a direct or indirect material interest;

- has entered into any agreement or understanding with any person with respect to any future employment by the Company or its affiliates or any future transactions to which the Company or any of its affiliates will or may be a party;

- has a contract, arrangement or understanding within the past year with any person with respect to the Company's securities;

- has any agreement, arrangement or understanding with any person with respect to any future employment with the Company or any of its affiliates or with respect to any future transactions to which Company or any of its affiliates may be a party; or

- is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries in any material legal proceeding.

In the past, Mr. Pearlman has acted as an advisor and an "employee consultant" to the Company from time to time with respect to various financing and acquisition activities and has received customary fees and compensation for such services. During 2003, the Company paid Gemini Partners II L.P., a company affiliated with Mr. Pearlman, $206,056.19 in consulting and advisory fees. Mr. Pearlman is not presently providing any consulting or advisory services to the Company.

On June 19, 2003, Mr. Pearlman and the Company entered into an agreement pursuant to which Mr. Pearlman was retained to provide advisory services to the Company with respect to various financing activities. In consideration of such services, Mr. Pearlman was paid $70,000 in cash (which is included in the $206,056.19 amount described above) and was entitled to retain certain restricted stock previously issued to him without the risk of forfeiture due to the termination of his services. Mr. Pearlman and the Company executed an Amendment to Restricted Stock Award Agreement, effective July 30, 2003. The purpose of the amendment was to amend the terms of a restricted stock award pursuant to which Mr. Pearlman granted

35,000 shares of restricted stock to provide that the restricted stock would not be forfeited upon termination of Mr. Pearlman's employment.

Pending Litigation

In *Liberation Investments, L.P., et al., v. Bally Total Fitness Holding Corporation and Paul A. Toback*, Del. Ch. C.A. No. 1833-N, filed on December 11, 2005 in the Delaware Court of Chancery in connection with the Company's adoption and threatened use of a "stockholder rights plan" dated October 18, 2005 (the "Poison Pill"), Liberation is seeking an order declaring that the Board of Director's adoption of the Management Protection Provision (the "Provision") in the Poison Pill was a breach of fiduciary duty, that the use of the Provision to threaten Liberation or any other stockholder was an inequitable manipulation of the Board of Directors' and management's authority, and to preliminarily and permanently enjoin the Company from attempting to enforce the Provision or the Poison Pill against Liberation or any other stockholder. This proceeding is currently pending, and, while Liberation is unable to make a prediction as to its outcome, we believe that, based on the merits of our claim, we will prevail in this case.

In *Bally Total Fitness Holding Corp. v. Liberation Investments, L.P., et al.*, Del. Ch. C.A. No. 1820-N, filed December 5, 2005 in the Delaware Court of Chancery, the Company is seeking a declaratory judgment based upon the allegation that Liberation's stockholder proposal is invalid because it seeks to amend the Company's bylaws in a manner that violates the Company's charter and the Delaware General Corporation Law ("DGCL"). Liberation maintains that its stockholder proposal is consistent with both the Company's charter and the DGCL, which expressly provide for such amendments and allow shareholders to elect or remove corporate officers. This proceeding is currently pending, and, while Liberation is unable to make a prediction as to its outcome, we believe that the Company's claim is without merit and that we will ultimately prevail in this case.

In *Bally Total Fitness Holding Corp. v. Liberation Investments, L.P., et al.*, C.A. No. 05-841-JJF, filed on December 5, 2005 in the United States District Court for the District of Delaware (the "District Court"), the Company sought, but subsequently withdrew, a temporary restraining order against Liberation and Mr. Pearlman based upon alleged violations of the Securities Exchange Act of 1934 arising out of the proxy solicitation materials provided in connection with Liberation's stockholder proposals. The Company is currently seeking preliminary injunctive relief in the action. Liberation maintains that there is no basis for relief because the proxy solicitation materials complied with all applicable securities laws and regulations. This proceeding is currently pending, and, while Liberation is unable to make a prediction as to its outcome, we believe that the Company's claim is without merit and that we will ultimately prevail in this case.

In submissions made by the Company to the District Court, the Company claims that Liberation's proxy solicitation materials provided in connection with its stockholder proposals should contain further information and representations. Without conceding that any of the requested information is either required or relevant to shareholder consideration of Liberation's stockholder proposals, Liberation makes the following disclosures for the purpose of mooting wasteful and costly litigation commenced by the Company's management. The Company's complaint is available in its latest filings with the Securities and Exchange

Commission, including the Company's Form 8-K filed on December 7, 2005. In addition, a December 10, 2005 letter, in which the Company lists the alleged deficiencies with Liberation's preliminary proxy statement, is available in Liberation's Schedule 13D Amendment filed on December 14, 2005.

Disclosures Regarding Mr. Pearlman's Historical Relationship with Bally

| Bally's Allegations | Liberation's Responses |
|---|---|
| 1. Bally alleges that Liberation and Mr. Pearlman did not disclose Mr. Pearlman's "close personal and professional association with Bally's former management team, including Lee Hillman": | Mr. Pearlman maintains a personal relationship with Mr. Hillman, the former Chief Executive Officer of the Company. Mr. Pearlman maintains no relationship with any other member of the Company's former management team. |
| 2. Bally alleges that Liberation and Mr. Pearlman did not disclose "Hillman's and The Lee S. Hillman Revocable Trust's investment in [the Liberation entities] and [Hillman's] advisory role with respect to the Liberation entities": | The Lee S. Hillman Revocable Trust is currently a small limited partner in Liberation Investments, L.P., whose investment represents no more than 0.38% of the capital of Liberation Investments, L.P. and no more than 0.26% of the aggregate capital in both funds. Mr. Hillman plays no role, advisory or otherwise, in the business activities of the funds or any other entity controlled by Mr. Pearlman. Mr. Pearlman plays no role and has no ownership interest in Mr. Hillman's company, which despite the similarity in name, bears no affiliation with any of Mr. Pearlman's Liberation entities. |
| 3. Bally alleges that Liberation and Mr. Pearlman did not disclose Mr. Pearlman's "status as an employee consultant to Bally and [his being] part of the management team led by Hillman (as opposed to merely being an 'advisor' as the proxy statement currently states)": | When Mr. Pearlman was an advisor to Bally, he was considered by the Company as an "employee consultant". Mr. Pearlman acted as an "employee consultant" from time to time from 1996 to 2000, and from 2001 to 2003. However, Mr. Pearlman played no role in the management of the Company or the preparation of Company financial statements, and had no involvement in the Company's accounting practices. |
| 4. Bally alleges that Liberation and Mr. Pearlman did not disclose "the fact that Bally's Audit Committee concluded that the financial statements issued by Bally during Hillman's tenure were required to be restated and that the errors therein were a direct result of the 'culture... that encouraged aggressive accounting' that existed under Hillman's leadership": | Liberation and Mr. Pearlman acknowledge that the quoted language on the left was made by the Company's Audit Committee, but continue to find no relevant connection between those conclusions and the stockholder proposals in Liberation's proxy solicitation materials. |

Disclosures Regarding Liberation's and Mr. Pearlman's Motives

    The Company claims that Liberation should disclose that it and Mr. Pearlman have certain motives in seeking approval for stockholder proposals that would permit shareholders to remove the Chief Executive Officer and to remove Mr. Toback from that office. Liberation and Mr. Pearlman deny the following motives claimed by the Company:

| Bally's Allegations | Liberation's Responses |
| --- | --- |
| 1. Bally alleges that Liberation and Mr. Pearlman desire "to displace current management": | Liberation and Mr. Pearlman deny any current motive to displace any member of current management other than Mr. Toback. The purpose of the stockholder proposal is to displace Mr. Toback only. |
| 2. Bally alleges that Liberation and Mr. Pearlman desire "to make it appear that current management is to blame for the accounting errors leading to the Company's restatements" of its Financial Statements: | Liberation and Mr. Pearlman have not made and do not intend during this proxy solicitation to make any such claim. |
| 3. Bally alleges that Liberation and Mr. Pearlman desire "to deflect attention from the fact that an independent investigation found Hillman and former management responsible for the 'culture. . . that encouraged aggressive accounting' that led to those errors": | Liberation and Mr. Pearlman have no such intention. |
| 4. Bally alleges that Liberation and Mr. Pearlman desire "to prevent current management from taking action against Hillman": | Liberation and Mr. Pearlman have not prevented and do not intend to prevent current management or the Board of Directors from taking whatever actions are in the Company's interests, including action against Mr. Hillman. Liberation only seeks a shareholder vote on removal of a single officer, Mr. Toback. |
| 5. Bally alleges that Liberation and Mr. Pearlman desire "to retaliate against current management for the Audit Committee's independent investigation": | Liberation and Mr. Pearlman have not and do not seek any such retaliation. Liberation seeks only the removal of one member of current management. |

Other Bally Allegations Regarding Liberation's Intentions

| Bally's Allegations | Liberation's Responses |
|---|---|
| 1. Bally alleges that "at the time [Liberation and Mr. Pearlman] sought redemption of Bally's Stockholder Rights Plan, and disclaimed any present intention to purchase additional stock, [Liberation and Mr. Pearlman] in fact intended to purchase additional shares, as evidenced by their subsequent purchases which more than doubled their holdings": | Liberation has purchased significant amounts of Company stock since it successfully sought the redemption of the Company's Stockholder Rights Plan. As evident in its filings with the Securities and Exchange Commission at the time in connection with the redemption, Liberation consistently stated that it may purchase additional shares. In Liberation's Schedule 13D Amendment filed on July 13, 2004, Liberation clearly stated that "[it] intends to monitor and review the Company's redemption of its stockholder rights plan and the Company's policies with respect thereto…it may pursue alternatives to maximize the value of their investment in the Company. Such alternatives could include, without limitation, (i) the purchase of additional Common Stock in the open market, in privately negotiated transactions or otherwise..." |
| 2. Bally alleges that Liberation and Mr. Pearlman "intended by accumulating shares in excess of [10%] of the total outstanding shares at Bally, to trigger the vesting of shares of restricted stock granted to Mr. Pearlman and others under the Company's Long Term Incentive Plan": | Liberation and Mr. Pearlman deny any such intention in purchasing over 10% of the outstanding stock, and know of no reason that the purchases should have any relevance to a shareholder vote on the removal of Mr. Toback. Indeed, Mr. Pearlman has been very critical of the propriety of the vesting and has urged all recipients to give back their shares to the Company and offered to do so himself, as evident in Liberation's letter dated December 6, 2005, to the Board of Directors of the Company, filed with Liberation's Schedule DFAN14A dated December 7, 2005. |
| 3. Bally alleges that Liberation and Mr. Pearlman are working "in concert [with Hillman and Pardus] in order to elect Pardus' slate of proposed directors, including Kornstein": | While Liberation may vote to support the Pardus slate of proposed directors—two of which are now supported by the Company—Liberation and Mr. Pearlman are not working in concert with Pardus to accomplish their election. In fact, Liberation specifically expresses no opinion and makes no recommendation with respect to the Pardus nominees throughout its proxy statement. |

4. Bally alleges that Mr. Pearlman did not disclose "the fact that Kornstein has long been affiliated with [him]":

Don R. Kornstein, one of Pardus' director nominees, was suggested as a possible candidate by Mr. Pearlman. During the 17 years of their acquaintance, Mr. Pearlman has been involved in a few business relationships with Mr. Kornstein. In 1988, while Mr. Kornstein was a senior managing director at Bear Stearns, the firm was retained by Mr. Pearlman in connection with an unsolicited bid for Arkansas Best. Mr. Pearlman, on the other hand, was retained by Jackpot Enterprises, Inc. to advise on a single mergers and acquisitions deal during Mr. Kornstein's tenure as an officer and director of the company from 1994 to 2000. In 2003, Mr. Pearlman nominated Messrs. Hillman and Kornstein for election to the Board of Directors of another company, namely, InterTan, Inc., in a proxy contest which ultimately resulted in settlement. Currently, Mr. Pearlman has no business relationship with Mr. Kornstein, other than the small investment that Mr. Kornstein and his wife have jointly made in Liberation Investments, L.P., which investment represents no more than 0.38% of the capital of Liberation Investments, L.P., and no more than 0.26% of the aggregate capital of both funds.

5. Bally alleges that Mr. Pearlman did not disclose his "involvement in other proxy contests where he nominated Hillman and Kornstein to his proposed insurgent slate, his involvement in prior corporate takeover attempts, his history of using proxy contests to force a company to either accede to his demands or face replacement of their management and boards, and his being sued in connection with such actions for not stating his true intentions in disclosures required by the SEC":

See Liberation's response above for the specific proxy contest in which Mr. Pearlman nominated Mr. Hillman and Mr. Kornstein to the board. The investment objective of the Liberation funds is to maximize total return for each investment by employing activist strategies to promote necessary changes in a target company and thereby increase shareholder value. In fact, one of the Company's current directors, J. Kenneth Looloian, was nominated by Mr. Pearlman as a director candidate in a proxy contest for Healthco International, Inc. Hence, Mr. Pearlman and/or Liberation have been involved in other proxy contests, some of which have resulted in litigation. Mr. Pearlman disputes the Company's pejorative characterization of his and Liberation's "involvement in other proxy contests".

# EXHIBIT C

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

```
BALLY TOTAL FITNESS HOLDING        :
CORPORATION,                       :
                                   :
               Plaintiff,          :
                                   :
         v                         : Civil Action
                                   : No. 1820-N
LIBERATION INVESTMENTS, L.P.,      :
LIBERATION INVESTMENTS, LTD.,      :
LIBERATION INVESTMENT GROUP LLC, and :
EMANUEL R. PEARLMAN,               :
                                   :
               Defendants.         :
```

- - -

                    Chancery Court Chambers
                    Court of Chancery Courthouse
                    34 The Circle
                    Georgetown, Delaware
                    Wednesday, December 7, 2005
                    11:06 a.m.


- - -

BEFORE:  HON. WILLIAM B. CHANDLER III, Chancellor.


- - -


TELEPHONE CONFERENCE

- - -


--------------------------------------------------------
CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0524

2

```
 1   APPEARANCES:  (via speakerphone)

 2          RAYMOND J. DiCAMILLO, ESQ.
            GREGORY P. WILLIAMS, ESQ.
 3          Richards, Layton & Finger, P.A.
                     -and-
 4          LAURIE B. SMILAN, ESQ.
            JANET LINK, ESQ.
 5          MICHAEL FARIS, ESQ.
            of the Virginia Bar
 6          Latham & Watkins LLP
              for Plaintiff
 7
            STEPHEN E. JENKINS, ESQ.
 8          STEVEN T. MARGOLIN, ESQ.
            Ashby & Geddes, P.A.
 9            for Defendants

10

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1              THE COURT:  Good afternoon -- or good

 2   morning, counsel.

 3              MR. JENKINS:  Good morning, Your

 4   Honor.

 5              MR. DiCAMILLO:  Good morning, Your

 6   Honor.

 7              THE COURT:  I'm not sure who I have.

 8   Do I have Mr. DiCamillo?

 9              MR. DiCAMILLO:  Yes, Your Honor.

10              THE COURT:  And do I have Mr. Jenkins?

11              MR. JENKINS:  Yes, Your Honor, and

12   also Steven Margolin.

13              MR. DiCAMILLO:  Your Honor, this is

14   Mr. DiCamillo.  I have some other people here with me.

15   I'll introduce them and explain why I have such a

16   large group here in my conference room.

17              I have Mr. Williams from my office,

18   whom you know.  And also from Latham & Watkins I have

19   Laurie Smilan, Janet Link, and Michael Faris.

20              As we disclosed in our papers that we

21   filed in this Court, at the same time we filed this

22   action, we also filed an action in Federal Court here

23   in Delaware and moved for a temporary restraining

24   order.  Judge Farnan has scheduled a hearing on our
```

4

1   motion for temporary restraining order for this

2   afternoon at 2:30.  And the -- Miss Smilan and the

3   Latham team are heading up the -- the charge in the

4   federal action.  So they're all here in Delaware for

5   that hearing this afternoon.

6               THE COURT:  Well, do you want to

7   present your application for scheduling in this matter

8   now?

9               MR. DiCAMILLO:  Yes.

10              THE COURT:  All right.

11              MR. DiCAMILLO:  Thank you, Your Honor.

12              The Court is familiar with some of the

13  background facts from the prior cases that have been

14  before the Court.  But I do want to highlight a few

15  key facts that I think are important to the Court's

16  consideration of an appropriate schedule in this

17  matter.

18              As the Court is aware, an annual

19  meeting is currently scheduled for January 26th, 2006,

20  approximately seven weeks from now.  That meeting was

21  scheduled in connection with the settlement of an

22  action that Liberation brought in this Court pursuant

23  to Section 211.

24              Ostensibly there are two stockholder

5

1    solicitations going on in connection with this

2    meeting, although, as I'll explain, they're really

3    related.

4                  Pardus, who was mentioned in our

5    papers in the 220 action, is -- is a stockholder that

6    holds about 14 percent of the stock.  They propose a

7    slate of three director nominees for election at the

8    January annual meeting.  One of those nominees is Don

9    Kornstein.  Mr. Kornstein is a long-time associate of

10   Emanuel Pearlman, who is the principal of Liberation.

11                 Mr. Kornstein was proposed by

12   Liberation as a director nominee in another company in

13   which Liberation holds stock.  Mr. Pearlman also

14   previously suggested to Bally that it put

15   Mr. Kornstein on its board.

16                 So what we have here is Pardus and

17   Liberation have worked out some deal between them

18   whereby Pardus nominated Mr. Kornstein and put it

19   on -- put Mr. Kornstein on its slate at Mr. Pearlman's

20   suggestion.

21                 Then we also have Liberation, who's

22   made a stockholder proposal which is at issue in this

23   action.  As -- as I see it, the proposal is really --

24   really has two pieces to it.  One is a proposal to

6

1    amend Bally's bylaws to give the stockholders the

2    power to remove the chief executive officer.  The --

3    the second piece is amending the bylaws to provide

4    that the board of directors cannot amend the provision

5    that I just talked about, the one that gives the

6    stockholders the right to remove the chief executive

7    officer.

8                    Liberation has not filed a preliminary

9    proxy statement yet in connection with its stockholder

10   proposal; but since it has made the proposal, it has

11   made three separate filings with the SEC regarding the

12   proposal; and, as well, Liberation representatives

13   have been talking to the press about their proposal.

14                   So what Liberation has already begun

15   doing is, one, soliciting support for its proposal

16   without filing preliminary proxy materials with the

17   SEC; and at the same time, by criticizing current --

18   current management and calling for the removal of the

19   chief executive officer, Mr. Toback, Mr. Pearlman is

20   using his stockholder proposal as a platform to

21   campaign for his friend, Mr. Kornstein, which is

22   part -- part of Pardus' slate.

23                   Because we believe that the

24   shareholder proposal is invalid, the market must know

7

1    that fact now, and Liberation must be stopped from

2    soliciting support, both directly for its proposal and

3    indirectly for Mr. Kornstein, who is part of Pardus'

4    slate.

5              And that's what brings us here this

6    morning, Your Honor.  Expedition is appropriate in

7    this case for at least three reasons.  First, we

8    believe that the stockholder proposal is clearly

9    invalid on its face.

10              Now, Mr. -- Mr. Jenkins submitted a

11    letter to the Court this morning.  He expressed his

12    view on why the first piece of the proposal is not

13    invalid, the piece that gives -- that he believes

14    gives the stockholders the right to remove the CEO.

15    But there's also the second piece that purports to

16    prohibit the directors from amending the bylaws.  He

17    really has no response to that piece of the proposal.

18    That proposal is in clear contradiction to the terms

19    of the certificate of incorporation that gives the

20    board of directors the right to alter, amend, or

21    repeal the bylaws.

22              So we have out there, we believe, a

23    stockholder proposal that is invalid on its face.

24              Mr. Jenkins does raise one argument

8

1    with respect to the amendment he seeks, and I think

2    that argument is really a red herring.  The argument

3    that he brings up is that there is a provision in

4    Bally's current bylaws that says only stockholders can

5    amend -- it's actually two particular provisions of

6    the bylaws.

7                    Just as a background fact, that

8    provision was put in there as part of a settlement

9    with another hedge fund and certain stockholder a

10   couple years ago.  But -- but the real point of -- of

11   the argument is that there is nothing wrong with a

12   board of directors giving up a power that it has, and

13   that's what the board has done in connection with this

14   one bylaw provision that Mr. Jenkins points out.  And

15   that is confirmed by the Jones Apparel case, which

16   I'll just take a -- a second to explain.

17                    Section 213 of the -- of the Delaware

18   General Corporation Law deals with record dates.  And

19   it says, "In connection with action by written

20   consent, the record date shall be either the date that

21   the first written consent is delivered or such other

22   date as determined by the board of directors."

23                    In Jones Apparel, there was a

24   provision in the company's charter that said the

9

1    record date for written -- for action by written

2    consent shall be the date of delivery of the first

3    written consent.

4                   In that action, a stockholder

5    delivered a written consent, and the -- the board

6    purported to set a record date that was different than

7    the date of delivery of the first written consent.

8                   And what Vice Chancellor Strine

9    acknowledged in that case was that sure, the board has

10    the power in the statute to set a record date in

11    connection with a written consent; but they chose to

12    give up that power in the charter.  Here, it's the

13    exact same thing.  The board has the power in the

14    charter to amend the bylaws.  They have chosen to give

15    up that power with respect to a very narrow provision

16    of the bylaws.  It does not follow from that that

17    these stockholders can take that power away from the

18    board.

19                   So as we see it, there really is no

20    defense to our claim that the piece of the proposal

21    that purports to prohibit the directors from amending

22    the bylaws is invalid.

23                   Another reason for expedition is, the

24    annual meeting's approximately seven weeks away.  The

1    company's filed its preliminary proxy materials.

2    Pardus has filed its preliminary materials.

3    Liberation hasn't filed its preliminary materials yet;

4    but as I mentioned before, they're out, you know,

5    soliciting essentially -- soliciting support for their

6    proposal, conditioning the market, calling for the

7    removal of Mr. Toback, essentially affecting people's

8    views not only with respect to the validity of their

9    proposal but with respect to whether or not they

10   should vote for Pardus' slate.  Stockholders are

11   beginning the process now of deciding how they should

12   vote on these important matters that are before the

13   company.  They should know as soon as possible that

14   the Liberation proposal is invalid.

15              And finally, while I'm asking for a

16   very prompt schedule here, the work that needs to be

17   done is really far less intense than -- than the work

18   required in most expedited schedules that this Court

19   orders.  The issues are purely legal in nature.

20   Concurrently with the filing of our complaint, we

21   filed our opening brief on the merits.  It's 18 pages.

22   It is extremely straightforward.

23              Mr. Jenkins, in his letter this

24   morning, has essentially filed his answering brief on

11

1    the proposal.  I'm -- I'm sure that Mr. -- Mr. Jenkins

2    will want to file, you know, something in --

3    additional that is a little bit more fulsome, but

4    there's the -- the crux of his argument is already

5    thought up and written.  So there's no reason why this

6    matter can't be completely briefed by some point next

7    week and, subject to the Court's calendar, argued at

8    the Court's earliest opportunity.  We're not asking

9    for any discovery.  We don't think any discovery is

10   necessary.

11                On that type of schedule, obviously

12   subject to the Court's calendar, the matter could be

13   decided before the holidays; and the company and all

14   its stockholders will know the parameter of the issues

15   to be decided at the annual meeting going into the

16   final critical weeks of the solicitation period.

17                I just want to take a second to

18   respond to a couple of the points that Mr. Jenkins

19   raised in his letter this morning.

20                One point that he makes is that the

21   Court should do nothing now, kind of wait and see what

22   happens.  And we don't think that's appropriate in

23   that case for a couple of reasons.  One, as I've said

24   a couple times during this call, the harm is occurring

1    now.  Mr. Pearlman and Liberation are out there

2    conditioning the market, talking up their proposal,

3    the validity of the proposal, calling for the removal

4    of Mr. Toback, and using their proposal as a platform

5    to campaign for Mr. Kornstein.

6              Also, in support of the proposition

7    that Your Honor should just wait and see what happens,

8    Mr. Jenkins cites the Cumberland Farms case.  That

9    case is very different than the situation that's

10   before the Court right now.  In Cumberland Farms, what

11   plaintiffs were asking the Court to do is appoint a

12   custodian.  And I think everyone will agree that that

13   is an extraordinary remedy that this Court does not

14   impose lightly.  In order to appoint a custodian, you

15   need to have a trial.

16             Also, in order to appoint a custodian,

17   you need to show there's deadlock.  And what the Court

18   found in the Cumberland Farms case on the motion to

19   dismiss was, you know, "I'm not satisfied that there's

20   deadlock yet.  So what we need to do is have an annual

21   meeting to establish whether or not there, in fact, is

22   deadlock.  And if there is, then I'll entertain," you

23   know, "the" -- "the trial on the request for the

24   custodian."

13

1          We're not asking for any extraordinary

2     relief like that.  All we're asking for is the

3     resolution of a legal issue that's essentially fully

4     briefed.  There's no prejudice to the other side,

5     because we're not asking for any discovery.  No

6     discovery is necessary.  There's -- there's really no

7     reason to delay decision on -- on this -- on these

8     issues.

9          And the -- the final point that I'll

10    make in response to Mr. Jenkins' letter is, he

11    criticizes us for purportedly ignoring legislative

12    history, Section 142.  If you look closely, however,

13    what -- what is cited in the letter, it's not

14    legislative history; it's the Skadden treatise on

15    Delaware corporate law, which happens to have

16    Professor Folk's name on it, but it is not the

17    legislative history.  It's a commentary, just like any

18    other commentary; and it's entitled to no less weight

19    than the commentary from people such as Professor

20    Coffee, which we cite in our brief, that look at the

21    same legislative history and reach the opposite

22    conclusion.

23          Unless Your Honor has any questions,

24    what I would ask is that this matter be scheduled for

14

1   prompt final resolution, prompt briefing schedule and

2   oral argument within, you know -- at the Court's

3   earliest convenience.

4                    THE COURT:  Well, the question I have

5   for you, Mr. DiCamillo, is, I'm not sure I'm still

6   clear as to why, if Mr. Pearlman and Liberation are

7   out there, as you say, conditioning the market -- your

8   side isn't defenseless in that effort.  You can

9   communicate with the market as well.  Why shouldn't I

10  just let the process work and see what the election

11  result is and fix the problem after that?  If you're

12  correct that there's a problem, then why can't I fix

13  it after the election?

14                    MR. DiCAMILLO:  I think at that point,

15  Your Honor, the harm is already done.  We've -- we

16  will have gone through a, you know, seven-week

17  solicitation where Mr. Pearlman and Liberation will be

18  saying their proposal is valid.  We'll be saying the

19  proposal is invalid.  So we can certainly express our

20  views to the market, I agree with you.

21                    However, we've obviously got two

22  differences of opinions.  Mr. Jenkins thinks he's

23  right.  I think I'm right.  One of us is wrong.  It

24  would seem to be a simple matter, particularly when

1    we're -- we're not asking for any discovery and the

2    matter is already fully briefed, for the Court to step

3    in and tell us and the market whether this proposal is

4    valid or not.

5                    THE COURT:  But if -- if your side

6    wins; that is, there isn't a sufficient shareholder

7    vote in favor of the proposal being advanced by

8    Liberation, then this case is moot and the Court isn't

9    required to opine on anything.  So it's only in the

10   event that your side loses that this case is still

11   ripe for decision.  And if your side loses, you're

12   right that this proposal is legally invalid, then I

13   can declare it legally invalid, and the harm that

14   you're concerned about disappears.

15                    I still am not sure I understand, Mr.

16   DiCamillo, how the harm is truly irreparable and why I

17   can't fix the harm after the fact.

18                    MR. DiCAMILLO:  Let me -- a couple

19   responses to that, Your Honor.  One, what's -- what

20   the proposal calls for is the immediate removal of Mr.

21   Toback.  So if it wins, Mr. Toback is out as the CEO

22   and chairman of the board.  So there will be a period

23   of time where Mr. Toback, we believe, has the right to

24   be CEO and chairman and that the stockholders do not

1  have the power to remove him, will, in effect, be out

2  and there will be a period, you know, however long it

3  takes to get the matter to Your Honor for Your Honor

4  to decide, where this company will really be in a -- a

5  very precarious situation, because we're not going to

6  know who's running it.

7              Also, you know, there have been other

8  situations before the Court where this argument has

9  been made, that "Let's just wait and see what happens

10 at the election."  And I think the Court, in the -- in

11 some of these situations, has said to itself, you

12 know, "There's a hard vote to get."  You know,

13 "They've got to get a significant number of the votes.

14 And why don't I just wait and see" -- "it's likely

15 this isn't going to pass.  Why don't I just wait and

16 see what happens."

17             Looking at our stockholder profile,

18 you know, this is not a situation where Mr. Pearlman

19 needs to convince a large majority of the unwashed

20 masses that -- to vote for this proposal.  This -- the

21 stock of this company, as a lot of companies today, is

22 held largely by a few hedge funds.  Pardus,

23 Liberation, and another entity, Waddell, own

24 34 percent of the stock.  And, you know, if you look

17

1    at -- you know, 75 percent of the stock is in the

2    hands of -- of about 15 -- 15 holders.  So, you know,

3    there's a real possibility of gaining support for this

4    proposal.

5                    And we think the more prudent thing to

6    do is for the Court to declare whether or not the

7    proposal's invalid, particularly in a situation where

8    there is no prejudice to the other side, which I think

9    distinguishes this case from, really, all the other

10   cases before the Court where -- where a plaintiff has

11   been asking for expedited relief prior to a meeting.

12   They -- when plaintiffs typically come in, "We need

13   expedited relief prior to the meeting.  We need," you

14   know, "X number of depositions.  We need," you know --

15   "we need to have a hearing before the" -- "before the

16   Court.  We need to have extensive briefs written."

17                    We don't have that situation.  As I

18   said a couple times, this matter is essentially

19   briefed.  We don't need any discovery.  There's no

20   prejudice to the other side.  We think, you know, it

21   makes sense for the Court to decide whether or not

22   this proposal is invalid so that everyone knows going

23   forward in the proxy solicitation and for the annual

24   meeting what the parameters are.

18

1                    THE COURT:  Well, I -- I hear you, Mr.
2       DiCamillo.  I -- I'm going to get off you and move on
3       over to Mr. Jenkins.
4                    But, you know, it strikes me that
5       if -- if the election were held and the proposal is
6       adopted, that at that point if -- if you were to come
7       in and seek emergency relief in the form of allowing
8       Mr. Toback to remain in office until the briefing was
9       completed and the decision reached on whether or not
10      the proposal was valid or not, I suspect you could
11      probably find a receptive audience to that, because, I
12      mean, that's typical.  In 225 actions, there are
13      status quo orders all the time entered by this Court
14      that maintain the status quo until the fundamental
15      validity of the election or of the newly-elected
16      officer or, in this case, the removal of the officer
17      can be legally determined.
18                   And there's also the prospect that you
19      could follow the example, although I'm certainly not
20      recommending it and don't want to be quoted in that
21      fashion; but there is the former example of Mr. Auhll,
22      the CEO of Circon during the battle with U. S.
23      Surgical, who was voted out and then promptly restored
24      to office immediately after the vote.  And I -- and I

19

1   presume, you know, that that's a possible option.

2                   But let me hear from Mr. Jenkins first

3   before we go any further.

4                   MR. JENKINS:   Thank you, Your Honor.

5                   Your Honor, our view on this is --

6   it's fairly simple -- there is no irreparable harm,

7   and we also think it's an incredibly weak argument on

8   the other side.  But I'm not going to go to the

9   merits.  If -- if and when we finally get there, we

10  will have a much more -- larger brief than -- than

11  what we put before Your Honor.

12                  But we think, in fact, their argument,

13  this imperial notion of 141, that it trumps everything

14  else in the Delaware General Corporation Law, it's

15  wrong, and similar arguments have been rejected before

16  by the Court.  But you don't even have to look at the

17  similar arguments.  You just look at the statute and

18  the history of the statute.

19                  But turning to the irreparable harm

20  argument and -- there is no irreparable harm

21  argument here.  As Your Honor pointed out, yes, if we

22  oust Mr. Toback -- and we have to get 75 percent of

23  the outstanding.  So it's a tough burden.  If we oust

24  Mr. Toback, of course, they're going to come in, as in

1    every 225 action, because the directors are ousted

2    there as well, they're going to come in and say "Let"

3    -- "let him keep his place."  I'm not even going to

4    fight that, so long as we have an adequate status quo

5    order, because I know the practice of this Court.  And

6    the practice of this Court is necessarily to allow the

7    company to function while the Court determines which

8    side is right.

9              So there's not going to be any problem

10   about who's continuing in office.  If the directors

11   want to continue him in office in the face of a

12   75-percent stockholder vote, they will be able to come

13   in, seek a -- an order.  And, Your Honor, we will not

14   seek to stop a status quo order so long as -- as

15   relevant provisions are put in.  And -- and that's the

16   way we normally do things.

17             Now, they -- they come and say, well,

18   there isn't any harm -- harm to us to allowing us to

19   go forward.  I think there is, Your Honor, and I think

20   it's two things.  First, we will, of course, want to

21   bring -- if this action goes forward, we will want to

22   bring counterclaims.  Specifically, they have in the

23   last few days, the last week issued approximately a

24   million shares of stock to their senior executives.

1   We think it's about a million shares to senior

2   executives and others.  It was issued after we

3   announced this and before the end of the proxy --

4   before the record date, which is the 20th of December.

5   We would want to challenge that.

6              Now, we didn't bring a -- our own

7   complaint challenging that, because we thought that

8   could wait till the end.  It's a million shares out of

9   about 35 million out there.  If we only get 60 percent

10  of the vote, those shares won't matter.  If we get

11  73 percent of the vote, those shares very well might

12  matter.  But we thought that, too, could -- could wait

13  till the -- till after the meeting -- meeting --

14  meeting.  We bring it if it's necessary.

15             But if we're going to go forward with

16  things -- things now, we would like that to be heard

17  now, because it's really an outrageous thing that

18  happened; and -- and -- and that will -- will, indeed,

19  I think, take some discovery.

20             The other aspect of potential harm to

21  us or problem is the nice tight timetable.  They give

22  us -- after working for quite awhile on their brief,

23  they want to us put in a brief next week, they want

24  Your Honor to rule before Christmas; and that's all

1    it.  But it won't end there, even if we can arrange

2    for such a schedule.  And this is the kind of case

3    where I suspect Your Honor is going to want to write

4    something, if it's presented and some -- because it's

5    going to be an important issue on Delaware law or

6    could be.  It won't end there.  Whoever loses is going

7    to seek an appeal in the Supreme Court.  And that

8    appeal, based on our recent experience, isn't going to

9    be heard for several more weeks.  There isn't going to

10   be anything final until at least the middle of

11   January.  That doesn't aid anybody.  In fact, it just

12   casts doubt on our -- on our proposal -- or I think it

13   casts doubt on our proposal.  To me, it doesn't make

14   sense.

15            What does make sense here is to see

16   who gets the votes and then who wants to litigate --

17   litigate.  I would think, if we've got 75 percent of

18   the vote, that this board of directors, faced with

19   75 percent of their stockholders saying "We don't want

20   Mr. Toback," might decide it, too, doesn't want Mr.

21   Toback and that there won't be any litigation.  If we

22   get 40 percent of the vote, the board of directors --

23   well, there won't be any litigation, because we don't

24   have any claim -- claim -- claim -- claim.  We won't

1   have a court claim unless we get very close to

2   75 percent.

3                    That's, I think, the sensible way to

4   handle it -- to handle it, after the fact, when the

5   fact are known, when they're setting concrete and it

6   isn't speculation.  And, accordingly, Your Honor, we

7   would respectfully request the Court to deny the

8   motion to expedite.

9                    THE COURT:  Any last word, Mr.

10  DiCamillo?

11                   MR. DiCAMILLO:  Yes, Your Honor.  I'd

12  just like to make a few additional points.

13                   One, you know, we talked, and

14  Mr. Jenkins, you know, talked at length in his letter

15  of this morning, about irreparable harm.  We're not

16  asking the Court for preliminary injunction here.

17  We're asking for a declaration on the validity of the

18  proposal.  So we don't need to show irreparable harm

19  to get the relief we're requesting.

20                   But we think there is real irreparable

21  harm here.  We -- the company, as Your Honor I think

22  is aware, filed its restated financial statement on

23  November 30th, just last week.  Concurrently with the

24  filing of those financial statements, the company

24

1  announced that it hired JPMorgan to explore strategic

2  alternatives for the company.

3            I've heard from Mr. Jenkins that, you

4  know, if Mr. Toback is -- if they get the 75 percent,

5  Mr. Toback is out, you know, we can fix that later.

6  Well, there's going to be a period of time where this

7  company is stalled from its strategic process.

8            Liberation has been talking for 18

9  months about maximizing stockholder value, and that's

10  what the company is preparing to do.  If we have a

11  situation where the authority of the CEO is in

12  question -- and that can happen not only after a

13  75-percent vote but right now, where they are

14  trumpeting a proposal that -- that posits that the

15  stockholders have the power to remove the CEO -- that,

16  we believe, is misleading to investors.  We don't

17  believe the stockholders have the power to remove the

18  CEO.  But right now, because of the proposal, there is

19  a cloud over the chief executive officer of this

20  company of a company that is trying to explore

21  strategic alternatives.  They can't do that if the

22  authority of the CEO is in question.

23            Where -- we have a situation here

24  where it's a very simple legal issue regarding a

1   discrete issue of Delaware law.  We think this is a

2   situation where the Court should step in prior to the

3   meeting and, on a -- on a prompt basis, and -- and

4   decide whether or not the stockholders have the power

5   to remove the chief executive officer so the cloud

6   could be lifted.

7            MR. JENKINS:  Your Honor, if I may

8   just briefly respond?

9            THE COURT:  Sure.

10           MR. JENKINS:  We are not challenging

11   Mr. Toback's authority right now.  He's the CEO, for

12   good or ill, and he will be the CEO until he is

13   removed.

14          As for this notion that this could

15   affect the sale process, if they had a reason to

16   believe this could affect the sale process and,

17   therefore, was a grounds to claim there's the kind of

18   immediate irreparable harm necessary for an expedited

19   proceeding, they could have brought that in an

20   affidavit or in papers or something.  Instead, it's

21   just raised now.

22          I know no reason why it would possibly

23   hurt the sale process -- process.  And as we said --

24   and as I said, after the election, if we get the

1   75 percent -- percent, there will, no doubt, be a

2   status quo order in place, a -- and we can, no doubt,

3   negotiate a -- to make sure that there is adequate

4   authority to continue to deal with the sale process.

5          MR. DiCAMILLO:  Your Honor, if I could

6   just make one additional point.

7          As we all know, status quo orders,

8   while they allow the company to function, puts

9   significant handcuffs on the people that are in power.

10   I don't see how a strategic process could be run with

11   a status quo order in place.

12          THE COURT:  I understand that, Mr.

13   DiCamillo.  But I -- I fundamentally am just not

14   persuaded that there is a basis for me to gear up for

15   an emergency, an expedited briefing process, an

16   expedited decision with the intervention, No. 1 of the

17   holidays.  No. 2, there is going to be an appeal to

18   the Supreme Court, I can just be confident of that.

19   You're not going to get a decision ultimately on this

20   question that will really be able to put to rest any

21   of the questions that you've raised until much beyond

22   the date that you set for the stockholder meeting.  So

23   I think the period of indeterminancy and uncertainty

24   that's going to exist from now till then is just a

27

1    fact of life, that nothing I do is really going to

2    change that very much.

3                    So for those -- for the reason that

4    I'm not convinced that there's a threat of irreparable

5    harm, imminent irreparable harm, and because I'm also

6    fully convinced that I can remedy any injury, I can

7    remedy any illegal action that is later determined to

8    have been illegal, after the election occurs, assuming

9    that the election doesn't make it a moot issue,

10   anyway, I'm not going to schedule any sort of

11   accelerated or expedited proceeding before the -- the

12   election in question.

13                   If you want to discuss with

14   Mr. Jenkins -- and I would encourage that, that you

15   discuss with Mr. Jenkins the possibility, after that

16   election, of scheduling it on a prompt basis, I'll

17   help in that effort, if you need me; but I trust that

18   you and he can work out those particulars.

19                   If there's nothing further, counsel,

20   I'll let you go.

21                   MR. JENKINS:  Thank you very much,

22   Your Honor.

23                   MR. DiCAMILLO:  Thank you, Your Honor.

24        (The proceedings adjourned at 11:37 a.m.)

28

```
 1                         CERTIFICATE

 2

 3              I, NEITH D. ECKER, Official Court

 4    Reporter for the Court of Chancery of the State of

 5    Delaware, do hereby certify that the foregoing pages

 6    numbered 3 through 27 contain a true and correct

 7    transcription of the proceedings as stenographically

 8    reported by me at the hearing in the above cause

 9    before the Chancellor of the State of Delaware, on the

10    date therein indicated.

11              IN WITNESS WHEREOF I have hereunto set

12    my hand at Wilmington, this 7th day of December 2005.

13

14

15                    -----------------------------
                          Official Court Reporter
16                         of the Chancery Court
                             State of Delaware
17
                          CSR No.  113-PS
18

19

20

21

22

23

24
```

# EXHIBIT D

DEFA14A 1 a40985.htm BALLY TOTAL FITNESS CORPORATION

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.    )

Filed by the Registrant  ☑
Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☐  Definitive Proxy Statement
☐  Definitive Additional Materials
☑  Soliciting Material Pursuant to §240.14a-12

# BALLY TOTAL FITNESS HOLDING CORPORATION

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

☐  Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

_____

2) Form, Schedule or Registration Statement No.:

_____

3) Filing Party:

_____

4) Date Filed:

_____

SEC 1913 (02-02)

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

*Attached hereto is a letter to stockholders from Paul Toback, Chairman and Chief Executive Officer of Bally, dated December 13, 2005.*

**Important Additional Information Will be Filed with the SEC**
On December 6, 2005, Bally filed a preliminary proxy statement with the SEC. The proxy statement, when final, will be mailed to Bally stockholders. INVESTORS AND STOCKHOLDERS ARE URGED TO READ THE PROXY STATEMENT CAREFULLY WHEN IT BECOMES AVAILABLE BECAUSE IT WILL CONTAIN IMPORTANT INFORMATION ABOUT BALLY. Investors and stockholders will be able to obtain free copies of the Proxy Statement and other documents filed with the Securities and Exchange Commission (the "SEC") by Bally through the web site maintained by the SEC at www.sec.gov. In addition, investors and stockholders will be able to obtain free copies of the Proxy Statement and other documents filed with the SEC by Bally by directing a request to Bally Total Fitness Holding Corporation, 8700 West Bryn Mawr Avenue, Chicago, Illinois 60631, Attention: Investor Relations: Proxy Request.

**LISTING OF PERSONS WHO MAY BE DEEMED "PARTICIPANTS" IN THE SOLICITATION AND CERTAIN INFORMATION CONCERNING SUCH PERSONS IS SET FORTH IN THE COMPANY'S PRELIMINARY PROXY STATEMENT DATED DECEMBER 6, 2005, WHICH MAY BE OBTAINED THROUGH THE WEB SITE MAINTAINED BY THE SEC AT www.sec.gov. SINCE SUCH DATE, CARL J. LANDECK AND JAMES A. MCDONALD HAVE SOLD 25,000 AND 50,000 SHARES OF BALLY COMMON STOCK, RESPECTIVELY.**



**Bally Total Fitness Corporation**
8700 West Bryn Mawr Avenue
Chicago, Illinois 60631
773-380-8000

www.ballyfitness.com

December 13, 2005

DEAR SHAREHOLDER:

    As you are aware, in the past 18 months we have made significant progress on three of our most important objectives: (i) turning around the Company's operations, (ii) issuing financial statements from 2002 through September 30, 2005 after an eighteen month effort required to correct past accounting errors, and (iii) seeking long-term solutions to the Company's capital structure issues. We believe these and other actions will enhance value for our shareholders in the near- and long-term.

### *Turning Around the Operations and Issuing Five Years of Financial Information*

    On November 30, 2005, we filed our financial statements for 2004 and the first nine months of 2005 and restated those for 2000 through 2003. Our audited financial statements for 2002-2004 along with results from 2000 and 2001 are included in our Annual Report on Form 10-K enclosed with this letter, which as part of our continuing effort to hold down costs, is being sent to you in lieu of a traditional "glossy" annual report. Completing our audit so we could resume public reporting was a tremendously time consuming, complicated and costly task. However, it was also very fulfilling to be able to report improving results, including a net profit for the year to date, demonstrating that our strategy is beginning to work and that our efforts are yielding results. We reported a net profit of $1.8 million for the first nine months of 2005, compared to losses in 2003 and 2004. These strong results reflect revenues that are growing and our stringent cost reduction efforts that are decreasing costs.

|  | Nine Months Ended September 30 | | |
|---|---|---|---|
|  | **2005** | **2004** | **% Change** |
|  | (in millions) | | |
| Net Revenue | $ 807.5 | $ 789.3 | 2.3 |
| Operating Costs | $ 745.8 | $ 752.9 | (0.9) |
| Operating Income | $ 61.7 | $ 36.4 | 69.5 |
| Net Income (Loss) | $ 1.8 | ($ 13.3) | N/A |

    The future looks promising as well, due in large part to our initiatives designed to transform our business model and further improve and strengthen operations. Specifically, early indications suggest that we're benefiting from our new membership sales strategies, like the Build Your Own Membership Plan and our Family and Friends add-on program. These flexible and consumer friendly programs are part of Bally's new more customer-centric mindset designed to improve point-of-sale closing rates and reduce short-term attrition. We are also poised to kick-off our new 2006 marketing, including a new national advertising campaign designed to highlight our personalized approach to fitness. Contributing

to our improved results are continued emphasis on add-on services, such as personal training, and

our renewed focus on customer service and customer retention. As a testament to this new approach, the number of new joining members hit a record level in 2004, and even with all of the operational changes in 2005, this year we have exceeded 2004's level by 4%. And despite a small increase in company-wide member attrition, short-term attrition declined by approximately 4.5% in markets that converted to our new sales program.

### Strategic Action to Address our Capital Structure and Enhance Value

These important steps in building the business for the future and keeping costs in line will not succeed, however, if we do not address the challenges posed by our existing capital structure. Servicing the debt imposed on Bally by prior management leaves insufficient cash for reinvesting in clubs, marketing and other strategic initiatives. Simply stated, to capitalize on growth opportunities and compete more effectively in a dynamic marketplace, Bally requires additional capital.

To address this fundamental issue, we hired J.P. Morgan Securities Inc. to explore a range of strategic alternatives for Bally. The Blackstone Group (which has been advising the Company for the past year) will be working alongside J.P. Morgan. Potential alternatives include a recapitalization, the sale of securities or assets of the Company, or the sale or merger of Bally with another entity or strategic partner. In short, our investment bankers are charged with identifying the best option to improve value for all of our shareholders. We have a fair, independent and transparent process in place and this is one of our top priorities.

### Supporting Independent, Qualified Directors

Notwithstanding the transformation that has occurred at Bally—and the fact that we're on the right course—certain shareholders continue to criticize us in hopes that the turmoil they create will allow them or others to take control of this Company. Ironically, they praise our results, yet they offer no industry experience, no knowledge of the Company's business or its issues, and they propose no plan.

Bally's January 26, 2006 annual meeting, where the election of directors will take place, is fast approaching. Pardus Capital Management, our largest shareholder, has filed preliminary proxy materials to nominate three directors to Bally's Board. These nominees include Charles Burdick, Barry Elson and Donald Kornstein. **Remarkably, Pardus has launched this contest despite the fact that Bally has tried in earnest to avoid a proxy contest, and as an act of good faith, has agreed to nominate two of Pardus' nominees on our own slate.** Sadly, that isn't enough to satisfy Pardus, a 14% shareholder since September 2005 that wants 33% of your Board to be affiliated with them rather than independent. You should be aware that while Pardus purports to be acting for the interests of all shareholders, it has privately indicated an interest in leading a recapitalization transaction for Bally. So, in summary, Pardus wants to control one-third of the Board in hopes of allowing them to steer a future transaction in a manner that may not be in the best interests of all shareholders. Nonetheless, we agreed to place two representatives from Pardus on the Bally Board to prove our responsiveness to shareholders.

We have not, however, agreed to nominate Mr. Kornstein because he is closely affiliated with Mr. Pearlman, the CEO of Liberation Investments, a fact that neither Pardus nor Liberation has seen fit to disclose. As to Mr. Pearlman, he and his funds, Liberation Investments, which owns approximately 12% of our stock, continue to level personal attacks against the management team—a team that has worked hard to put this Company back on course. I ask each of you, simply, to do what we do and consider the source. Mr. Pearlman has a long and continuing association with the Company's former CEO Lee Hillman, including

serving as a highly paid consultant to Bally during Mr. Hillman's tenure. Mr. Hillman, CEO of Liberation Investment Advisory Group and an investor in Mr. Pearlman's Liberation fund (in violation of his separation agreement with Bally), was found by an independent investigation to have created a "culture that encouraged aggressive accounting," which ultimately led to the need for us to restate our financial statements at a cost of millions in special charges. Messrs. Hillman and Pearlman also saddled the Company with mountains of debt, engaged in misguided transactions in which they often had conflicts of interest, and left Bally with an outdated business model that we have worked tirelessly to fix.

It seems clear to us that both Pardus and Liberation are looking out for their own interests, not the interests of all shareholders. While both claim that their actions are aimed at enhancing shareholder value, the truth is that *Bally Total Fitness is already committed to enhancing value for all shareholders* and, as outlined above, has taken numerous steps and made great progress toward that end.

Reflecting our focus on enhancing value for all shareholders, in October the Board implemented a short-term Shareholder Rights Plan. Information on the plan is enclosed. The plan is designed precisely to preserve the rights of all shareholders and to ensure that those shareholders with their own agendas cannot steal control of Bally. The adoption of the Rights Plan will not foreclose a fair acquisition bid or any other capital transaction.

We have a strong independent Board of Directors, and have recently taken steps to further strengthen it. Earlier this month, we announced the addition of two directors, Steven Rogers and Adam Metz. Assisted by search firm Russell Reynolds, the Board's Nominating and Corporate Governance Committee conducted a thorough search and we are pleased that they attracted such outstanding candidates, both of whom bring excellent business backgrounds and a wealth of knowledge and experience to the Bally Board. In addition to the two Pardus candidates, Messrs. Burdick and Elson, Bally's third Board nominee is Eric Langshur, Chairman of the Audit Committee, a highly qualified independent director who has served Bally since 2004. Mr. Langshur's leadership contributed significantly to the successful completion of the recently completed financial statement audit. We strongly recommend that you re-elect Mr. Langshur and allow him to continue his exemplary work, along with our auditors and financial management team, to further improve Bally's processes and controls.

There's no question that we have made tremendous progress in turning Bally around and the Company is poised to build on its solid foundation. We look forward to continuing to communicate with you in the coming weeks and months. We also remain committed to building a strong Bally for the future and creating value for all of our shareholders.

Sincerely,

PAUL TOBACK
*Chairman and Chief Executive Officer*

**Important Additional Information**

On December 6, 2005, Bally filed a preliminary proxy statement with the SEC. The proxy statement, when final, will be mailed to Bally stockholders. INVESTORS AND STOCKHOLDERS ARE URGED TO READ THE PROXY STATEMENT CAREFULLY WHEN IT BECOMES AVAILABLE BECAUSE IT WILL CONTAIN IMPORTANT INFORMATION ABOUT BALLY. Investors and stockholders will be able to obtain free copies of the Proxy Statement and other filed with the Securities and Exchange Commission (the "SEC") by Bally through the web site maintained by the SEC at www.sec.gov. In addition, investors and stockholders will be able to obtain free copies of the Proxy Statement and other documents filed with the SEC by Bally by directing a request to Bally Total Fitness Holding Corporation, 8700 West Bryn Mawr Avenue, Chicago, Illinois 60631, Attention: Investor Relations: Proxy Request.

A LISTING OF PERSONS WHO MAY BE DEEMED "PARTICIPANTS" IN THE SOLICITATION AND CERTAIN INFORMATION CONCERNING SUCH PERSONS IS SET FORTH IN THE COMPANY'S PRELIMINARY PROXY STATEMENT DATED DECEMBER 6, 2005, WHICH MAY BE OBTAINED THROUGH THE WEB SITE MAINTAINED BY THE SEC AT www.sec.gov. SINCE SUCH DATE, CARL J. LANDECK AND JAMES A. MCDONALD HAVE SOLD 25,000 AND 50,000 SHARES OF BALLY COMMON STOCK, RESPECTIVELY.

Forward-looking statements in this letter including, without limitation, statements relating to the Company's plans, strategies, objectives, expectations, intentions, and adequacy of resources, are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements involve known and unknown risks, uncertainties, and other factors that may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.