# Exhibit 30, Part 2

removal of the Rights Agent or the appointment of the successor Rights Agent, as the case may be

Section 22. <u>Issuance of New Right Certificates</u>. Notwithstanding any of the provisions of this Agreement or of the Rights to the contrary, the Company may, at its option, issue new Right Certificates evidencing Rights in such form as may be approved by its Board of Directors to reflect any adjustment or change in the Purchase Price and the number or kind or class of shares or other securities or property purchasable under the Right Certificates made in accordance with the provisions of this Agreement In addition, in connection with the issuance or sale of Common Shares following the Distribution Date and prior to the Expiration Date, the Company shall, with respect to Common Shares so issued or sold pursuant to the exercise of stock options or under any employee plan or arrangement, granted or awarded, or upon exercise, conversion or exchange of securities hereinafter issued by the Company, in each case existing prior to the Distribution Date, issue Right Certificates representing the appropriate number of Rights in connection with such issuance or sale; <u>provided</u>, <u>however</u>, that (i) no such Right Certificate shall be issued if, and to the extent that, the Company shall be advised by counsel that such issuance would create a significant risk of material adverse tax consequences to the Company or the Person to whom such Right Certificate would be issued and (ii) no such Right Certificate shall be issued if, and to the extent that, appropriate adjustment shall otherwise have been made in lieu of the issuance thereof.

Section 23. <u>Redemption</u>

23 1. <u>Right to Redeem</u> The Board of Directors of the Company may, at its option, at any time prior to a Trigger Event, redeem all but not less than all of the then outstanding Rights at a redemption price of $0 001 per Right, appropriately adjusted to reflect any stock split, stock dividend, recapitalization or similar transaction occurring after the date hereof (such redemption price being hereinafter referred to as the "<u>Redemption Price</u>"), and the Company may, at its option, pay the Redemption Price in Common Shares, including, but not limited to, a fractional share of Common Shares (based on the "current per share market price," determined pursuant to Section 11.4, of the Common Shares at the time of redemption), cash or any other form of consideration deemed appropriate by the Board of Directors. The redemption of the Rights by the Board of Directors may be made effective at such time, on such basis and subject to such conditions as the Board of Directors in its sole discretion may establish.

23 2 <u>Redemption Procedures</u>. Immediately upon the action of the Board of Directors of the Company ordering the redemption of the Rights (or at such later time as the Board of Directors may establish for the effectiveness of such redemption), and without any further action and without any notice, the right to exercise the Rights will terminate and the only right thereafter of the holders of Rights shall be to receive the Redemption Price for each Right so held. The Company shall promptly give public notice of such redemption; <u>provided</u>, <u>however</u>, that the failure to give, or any defect in, any such notice shall not affect the validity of such redemption. The Company shall promptly give, or cause the Rights Agent to give, notice of such redemption to the holders of the then outstanding Rights by mailing such notice to all such holders at their last addresses as they appear upon the registry books of the Rights Agent or, prior to the

31

Distribution Date, on the registry books of the transfer agent for the Common Shares. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of redemption shall state the method by which the payment of the Redemption Price will be made. Neither the Company nor any of its Affiliates or Associates may redeem, acquire or purchase for value any Rights at any time in any manner other than that specifically set forth in this Section 23 or in Section 27, and other than in connection with the purchase, acquisition or redemption of Common Shares prior to the Distribution Date.

Section 24. _Notice of Certain Events_. In case the Company shall propose at any time after the earlier of the Shares Acquisition Date and the Distribution Date (a) to pay any dividend payable in stock of any class to the holders of Preferred Shares or to make any other distribution to the holders of Preferred Shares (other than a regular periodic cash dividend at a rate not in excess of 125% of the rate of the last regular periodic cash dividend theretofore paid or, in case regular periodic cash dividends have not theretofore been paid, at a rate not in excess of 50% of the average net income per share of the Company for the four quarters ended immediately prior to the payment of such dividends, or a stock dividend on, or a subdivision, combination or reclassification of the Common Shares), or (b) to offer to the holders of Preferred Shares rights, options or warrants to subscribe for or to purchase any additional Preferred Shares or shares of stock of any class or any other securities, rights, options or warrants, or (c) to effect any reclassification of its Preferred Shares (other than a reclassification involving only the subdivision of outstanding Preferred Shares), or (d) to effect any consolidation or merger into or with, or to effect any sale or other transfer (or to permit one or more of its Subsidiaries to effect any sale or other transfer), in one or more transactions, of 50% or more of the assets or earning power of the Company and its Subsidiaries (taken as a whole) to, any other Person (other than pursuant to a merger or other acquisition agreement of the type described in Section 1.3(ii)(A)(z)), or (e) to effect the liquidation, dissolution or winding up of the Company, or (f) to declare or pay any dividend on the Common Shares payable in Common Shares or to effect a subdivision, combination or consolidation of the Common Shares (by reclassification or otherwise than by payment of dividends in Common Shares), then, in each such case, the Company shall give to the Rights Agent and to each holder of a Right Certificate, in accordance with Section 25, a notice of such proposed action, which shall specify the record date for the purposes of such stock dividend, distribution of rights or warrants, or the date on which such reclassification, consolidation, merger, sale, transfer, liquidation, dissolution, or winding up is to take place and the date of participation therein by the holders of the Preferred Shares and/or Common Shares, if any such date is to be fixed, and such notice shall be so given in the case of any action covered by clause (a) or (b) above at least ten (10) days prior to the record date for determining holders of the Preferred Shares for purposes of such action, and in the case of any such other action, at least ten (10) days prior to the date of the taking of such proposed action or the date of participation therein by the holders of the Preferred Shares and/or Common Shares, whichever shall be the earlier.

In case any event set forth in Section 11.1.2 or Section 13 shall occur, then, in any such case, (i) the Company shall as soon as practicable thereafter give to the Rights Agent and to each holder of a Right Certificate, in accordance with Section 25, a notice of the occurrence of such event, which notice shall describe the event and the consequences of the event to holders of Rights under Section 11.1.2 and Section 13, and (ii) all references in this Section 24 to Preferred

32

Shares shall be deemed thereafter to refer to Common Shares and/or, if appropriate, other securities

Notwithstanding anything in this Agreement to the contrary, prior to the Distribution Date a filing by the Company with the Securities and Exchange Commission shall constitute sufficient notice to the holders of securities of the Company, including the Rights, for purposes of this Agreement and no other notice need be given.

Section 25. <u>Notices</u>. Notices or demands authorized by this Agreement to be given or made by the Rights Agent or by the holder of any Right Certificate to or on the Company shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Rights Agent) or by facsimile transmission as follows:

Bally Total Fitness Holding Corporation
8700 W. Bryn Mawr Avenue
Chicago, Illinois 60631
Attention: Corporate Secretary
Facsimile: (773) 399-0126
With a copy to:
Latham & Watkins LLP
233 S. Wacker Drive, Suite 5800
Chicago, IL 60606
Attention: Mark D. Gerstein
Facsimile No : (312) 993-9767

Subject to the provisions of Section 21 and Section 24, any notice or demand authorized by this Agreement to be given or made by the Company or by the holder of any Right Certificate to or on the Rights Agent shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Company) or by facsimile transmission as follows:

LaSalle Bank National Association
135 S. LaSalle Street
Suite 1960
Chicago, Illinois 60603
Attention: Gregory Malatia
Facsimile No : (312) 904-2236

Notices or demands authorized by this Agreement to be given or made by the Company or the Rights Agent to the holder of any Right Certificate (or, prior to the Distribution Date, to the holder of any certificate representing Common Shares) shall be sufficiently given or made if sent by first-class mail, postage-prepaid, addressed to such holder at the address of such holder as shown on the registry books of the Company.

Section 26. <u>Supplements and Amendments</u>. For so long as the Rights are then redeemable, the Company may in its sole and absolute discretion, and the Rights Agent shall, if

33

the Company so directs, supplement or amend any provision of this Agreement in any respect without the approval of any holders of Rights or Common Shares. From and after the time that the Rights are no longer redeemable, the Company may, and the Rights Agent shall, if the Company so directs, from time to time supplement or amend this Agreement without the approval of any holders of Rights (i) to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions herein or (ii) to make any other changes or provisions in regard to matters or questions arising hereunder which the Company may deem necessary or desirable, including but not limited to extending the Final Expiration Date; provided, however, that no such supplement or amendment shall adversely affect the interests of the holders of Rights as such (other than an Acquiring Person or an Affiliate or Associate of an Acquiring Person), and no such supplement or amendment may cause the Rights again to become redeemable or cause this Agreement again to become amendable other than in accordance with this sentence; provided further, that the right of the Board of Directors to extend the Distribution Date shall not require any amendment or supplement hereunder Upon the delivery of a certificate from an appropriate officer of the Company which states that the proposed supplement or amendment is in compliance with the terms of this Section 26, the Rights Agent shall execute such supplement or amendment

Section 27 Exchange.

27.1 <u>Exchange of Common Shares for Rights</u> The Board of Directors of the Company may, at its option, at any time after the occurrence of a Trigger Event, exchange Common Shares for all or part of the then outstanding and exercisable Rights (which shall not include Rights that have become null and void pursuant to the provisions of Section 11.1 2) by exchanging at an exchange ratio of one Common Share per Right, appropriately adjusted to reflect any stock split, stock dividend or similar transaction occurring after the date hereof (such amount per Right being hereinafter referred to as the "<u>Exchange Consideration</u>") Notwithstanding the foregoing, the Board of Directors shall not be empowered to effect such exchange at any time after any Acquiring Person shall have become the Beneficial Owner of 50% or more of the Common Shares then outstanding. From and after the occurrence of an event specified in Section 13 1, any Rights that theretofore have not been exchanged pursuant to this Section 27.1 shall thereafter be exercisable only in accordance with Section 13 and may not be exchanged pursuant to this Section 27 1. The exchange of the Rights by the Board of Directors may be made effective at such time, on such basis and with such conditions as the Board of Directors, in its sole discretion may establish

27.2 <u>Exchange Procedures</u> Immediately upon the action of the Board of Directors of the Company ordering the exchange for any Rights pursuant to Section 27 1 and without any further action and without any notice, the right to exercise such Rights shall terminate and the only right thereafter of the holders of such Rights shall be to receive the Exchange Consideration. The Company shall promptly give public notice of any such exchange; provided, however, that the failure to give, or any defect in, such notice shall not affect the validity of such exchange The Company promptly shall mail a notice of any such exchange to all of the holders of such Rights at their last addresses as they appear upon the registry books of the Rights Agent Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the

34

notice. Each such notice of exchange shall state the method by which the exchange of the Common Shares for Rights will be effected and, in the event of any partial exchange, the number of Rights which will be exchanged. Any partial exchange shall be effected pro rata based on the number of Rights (other than the Rights that have become null and void pursuant to the provisions of Section 11 2) held by each holder of Rights.

27.3.  Insufficient Shares  The Company may at its option substitute, and, in the event that there shall not be sufficient Common Shares issued but not outstanding or authorized but unissued to permit an exchange of Rights for Common Shares as contemplated in accordance with this Section 27, the Company shall substitute to the extent of such insufficiency, for each Common Share that would otherwise be issuable upon exchange of a Right, a number of Preferred Shares or fraction thereof (or equivalent preferred stock, as such term is defined in Section 11 2) such that the current per share market price (determined pursuant to Section 11.4) of one Preferred Share (or equivalent preferred share) multiplied by such number or fraction is equal to the current per share market price of one Common Share (determined pursuant to Section 11 4) as of the date of such exchange.

Section 28. Successors  All the covenants and provisions of this Agreement by or for the benefit of the Company or the Rights Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 29. Benefits of this Agreement.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Rights Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the Common Shares) any legal or equitable right, remedy or claim under this Agreement; but this Agreement shall be for the sole and exclusive benefit of the Company, the Rights Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the Common Shares).

Section 30. Determination and Actions by the Board of Directors  The Board of Directors of the Company shall have the exclusive power and authority to administer this Agreement and to exercise the rights and powers specifically granted to the Board of Directors of the Company or to the Company, or as may be necessary or advisable in the administration of this Agreement, including, without limitation, the right and power to (i) interpret the provisions of this Agreement and (ii) make all determinations deemed necessary or advisable for the administration of this Agreement (including, without limitation, a determination to redeem or not redeem the Rights or amend this Agreement) All such actions, calculations, interpretations and determinations (including, for purposes of clause (y) below, all omissions with respect to the foregoing) that are done or made by the Board of Directors of the Company in good faith shall (x) be final, conclusive and binding on the Company, the Rights Agent, the holders of the Rights, as such, and all other Persons, and (y) not subject the Board of Directors to any liability to the holders of the Rights

Section 31. Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this

35

Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 32. Governing Law. This Agreement and each Right Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

Section 33. Counterparts. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 34. Descriptive Heading. Descriptive headings of the several Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

36

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, as of the day and year first above written

BALLY TOTAL FITNESS HOLDING CORPORATION

By  /s/ Paul Toback

    Name: Paul Toback
    Title: President and Chief Executive Officer

LASALLE BANK NATIONAL ASSOCIATION

By  /s/ Gregory R. Malatia

    Name: Gregory R. Malatia
    Title: Senior Vice President

EXHIBIT A

FORM OF
CERTIFICATE OF DESIGNATIONS
of
SERIES B JUNIOR PARTICIPATING PREFERRED STOCK
of
BALLY TOTAL FITNESS HOLDING CORPORATION
(Pursuant to Section 151 of the
Delaware General Corporation Law)

Bally Total Fitness Holding Corporation, a corporation organized and existing under the General Corporation Law of the State of Delaware (hereinafter called the "Corporation"), hereby certifies that the following resolution was adopted by a duly authorized committee of the Board of Directors of the Corporation as required by Section 151 of the General Corporation Law at a meeting duly called and held on October 17, 2005.

RESOLVED, that pursuant to the authority granted to and vested in the Board of Directors of this Corporation (hereinafter called the "Board of Directors" or the "Board") in accordance with the provisions of the Certificate of Incorporation of this Corporation, the Board of Directors hereby creates a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), of the Corporation and hereby states the designation and number of shares, and fixes the relative rights, powers and preferences, and qualifications, limitations and restrictions thereof as follows:

Section 1. Designation and Amount. The shares of such series shall be designated as "Series B Junior Participating Preferred Stock" (the "Series B Preferred Stock") and the number of shares constituting the Series B Preferred Stock shall be 100,000. Such number of shares may be increased or decreased by resolution of the Board of Directors; provided, that no decrease shall reduce the number of shares of Series B Preferred Stock to a number less than the number of shares then outstanding plus the number of shares reserved for issuance upon the exercise of outstanding options, rights or warrants or upon the conversion of any outstanding securities issued by the Corporation convertible into Series B Preferred Stock.

Section 2. Dividends and Distributions.

(A) Subject to the prior and superior rights of the holders of any shares of any class or series of stock of this Corporation ranking prior and superior to the Series B Preferred Stock with respect to dividends, the holders of shares of Series B Preferred Stock, in preference to the holders of Common Stock, par value $0.01 per share (the

A-1

"Common Stock"), of the Corporation, and of any other stock ranking junior to the Series B Preferred Stock, shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable in cash on the first day of March, June, September and December in each year (each such date being referred to herein as a "Quarterly Dividend Payment Date"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series B Preferred Stock, in an amount per share (rounded to the nearest cent) equal to 1,000 times the aggregate per share amount of all cash dividends and 1,000 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions, other than a dividend payable in shares of Common Stock or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series B Preferred Stock. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision, combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount to which holders of shares of Series B Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event

(B) The Corporation shall declare a dividend or distribution on the Series B Preferred Stock as provided in paragraph (A) of this Section 2 immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock).

(C) Dividends shall begin to accrue and be cumulative on outstanding shares of Series B Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the record date for the determination of holders of shares of Series B Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date Accrued but unpaid dividends shall not bear interest Dividends paid on the shares of Series B Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding The Board of Directors may fix a record date for the determination of holders of shares of Series B Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be not more than 60 days prior to the date fixed for the payment thereof.

Section 3. <u>Voting Rights</u>. The holders of shares of Series B Preferred Stock shall have the following voting rights:

(A) Subject to the provision for adjustment hereinafter set forth, each share of Series B Preferred Stock shall entitle the holder thereof to 1,000 votes on all matters submitted to a vote of the stockholders of the Corporation. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision, combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the number of votes per share to which holders of shares of Series B Preferred Stock were entitled immediately prior to such event shall be adjusted by multiplying such number by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) Except as otherwise provided herein, in any other Certificate of Designations creating a series of Preferred Stock or any similar stock, or by law, the holders of shares of Series B Preferred Stock and the holders of shares of Common Stock and any other capital stock of the Corporation having general voting rights shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(C) Except as set forth herein, or as otherwise provided by law, holders of Series B Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

Section 4. <u>Certain Restrictions</u>

(A) Whenever quarterly dividends or other dividends or distributions payable on the Series B Preferred Stock as provided in Section 2 are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on shares of Series B Preferred Stock outstanding shall have been paid in full, the Corporation shall not:

(i) declare or pay dividends, or make any other distributions, on any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series B Preferred Stock;

(ii) declare or pay dividends, or make any other distributions, on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series B Preferred Stock, except dividends paid ratably on the Series B Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

A–3

(iii) redeem or purchase or otherwise acquire for consideration shares of any stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series B Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such junior stock in exchange for shares of any stock of the Corporation ranking junior (both as to dividends and upon dissolution, liquidation or winding up) to the Series B Preferred Stock; or

(iv) redeem or purchase or otherwise acquire for consideration any shares of Series B Preferred Stock, or any shares of stock ranking on a parity with the Series B Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(B) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner

Section 5. Reacquired Shares  Any shares of Series B Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock subject to the conditions and restrictions on issuance set forth herein, in the Amended and Restated Certificate of Incorporation, or in any other Certificate of Designations creating a series of Preferred Stock or any similar stock or as otherwise required by law.

Section 6. Liquidation, Dissolution or Winding Up. (A) Upon any liquidation, dissolution or winding up of the Corporation, voluntary or otherwise no distribution shall be made (1) to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series B Preferred Stock unless, prior thereto, the holders of shares of Series B Preferred Stock shall have received an amount per share (the "Series B Liquidation Preference") equal to $1,000 per share, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment, provided that the holders of shares of Series B Preferred Stock shall be entitled to receive an aggregate amount per share, subject to the provision for adjustment hereinafter set forth, equal to 1,000 times the aggregate amount to be distributed per share to holders of shares of Common Stock, or (2) to the holders of shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series B Preferred Stock, except distributions made ratably on the Series B Preferred Stock and all such parity stock in proportion to the total amounts to which the holders of all such shares are entitled upon such liquidation, dissolution or winding up  In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision, combination or consolidation of the outstanding shares of Common Stock (by

A-4

reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the aggregate amount to which holders of shares of Series B Preferred Stock were entitled immediately prior to such event under the proviso in clause (1) of the preceding sentence shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that are outstanding immediately prior to such event.

(B) In the event, however, that there are not sufficient assets available to permit payment in full of the Series B Liquidation Preference and the liquidation preferences of all other classes and series of stock of the Corporation, if any, that rank on a parity with the Series B Preferred Stock in respect thereof, then the assets available for such distribution shall be distributed ratably to the holders of the Series B Preferred Stock and the holders of such parity shares in proportion to their respective liquidation preferences.

(C) Neither the merger or consolidation of the Corporation into or with another corporation nor the merger or consolidation of any other corporation into or with the Corporation shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of this Section 6

Section 7. Consolidation, Merger, etc. In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case each share of Series B Preferred Stock shall at the same time be similarly exchanged or changed into an amount per share, subject to the provision for adjustment hereinafter set forth, equal to 1,000 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision, combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series B Preferred Stock shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 8. No Redemption. The shares of Series B Preferred Stock shall not be redeemable by the Corporation

Section 9. Rank. The Series B Preferred Stock shall rank, with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, junior to all series of any other class of the Corporation's Preferred Stock, except to the extent that any such other series specifically provides that it shall rank on a parity with or junior to the Series B Preferred Stock.

A-5

Section 10  Amendment  At any time any shares of Series B Preferred Stock are outstanding, the Amended and Restated Certificate of Incorporation of the Corporation shall not be amended in any manner which would materially alter or change the powers, preferences or special rights of the Series B Preferred Stock so as to affect them adversely without the affirmative vote of the holders of at least two-thirds of the outstanding shares of Series B Preferred Stock, voting separately as a single class.

Section 11  Fractional Shares.  Series B Preferred Stock may be issued in fractions of a share that shall entitle the holder, in proportion to such holder's fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series B Preferred Stock.

IN WITNESS WHEREOF, this Certificate of Designations is executed on behalf of the Corporation by its President and Chief Executive Officer this ___day of [_____], 2005.

Paul Toback
President and Chief Executive Officer

A-6

**EXHIBIT B**

[Form of Right Certificate]

Certificate No. R–

___Rights

NOT EXERCISABLE AFTER THE FINAL EXPIRATION DATE OR EARLIER IF NOTICE OF REDEMPTION OR EXCHANGE IS GIVEN OR IF THE COMPANY IS MERGED OR ACQUIRED PURSUANT TO AN AGREEMENT OF THE TYPE DESCRIBED IN SECTION 1 3(ii)(A)(z) OF THE AGREEMENT. THE RIGHTS ARE SUBJECT TO REDEMPTION AT $0 001 PER RIGHT, AND TO EXCHANGE ON THE TERMS SET FORTH IN THE AGREEMENT. UNDER CERTAIN CIRCUMSTANCES (SPECIFIED IN SECTION 11.1.2 OF THE AGREEMENT), RIGHTS BENEFICIALLY OWNED BY OR TRANSFERRED TO AN ACQUIRING PERSON (AS DEFINED IN THE AGREEMENT), OR ANY SUBSEQUENT HOLDER OF SUCH RIGHTS WILL BECOME NULL AND VOID AND WILL NO LONGER BE TRANSFERABLE

Right Certificate

BALLY TOTAL FITNESS HOLDING CORPORATION

This certifies that          , or registered assigns, is the registered owner of the number of Rights set forth above, each of which entitles the owner thereof, subject to the terms, provisions and conditions of the Rights Agreement, dated as of October 18, 2005, as the same may be amended from time to time (the "Agreement"), between Bally Total Fitness Holding Corporation, a Delaware corporation (the "Company"), and LaSalle Bank National Association, a national banking association, as Rights Agent (the "Rights Agent"), to purchase from the Company at any time after the Distribution Date and prior to 5:00 P M  Central time on the Expiration Date (as defined in the Agreement), at the offices of the Rights Agent, or its successors as Rights Agent, designated for such purpose, one one–thousandth of a fully paid, nonassessable share of Series B Junior Participating Preferred Stock, par value $0 01 per share (the "Preferred Shares") of the Company, at a purchase price of $13.00 per one one–thousandth of a Preferred Share, subject to adjustment (the "Purchase Price"), upon presentation and surrender of this Right Certificate with the Form of Election to Purchase and certification duly executed  The number of Rights evidenced by this Right Certificate (and the number of one one–thousandths of a Preferred Share which may be purchased upon exercise thereof) set forth above, and the Purchase Price set forth above, are the number and Purchase Price as of October 18, 2005, based on the Preferred Shares as constituted at such date  Capitalized terms used in this Right Certificate without definition shall have the meanings ascribed to them in the Agreement  As provided in the Agreement, the Purchase Price and the number of Preferred Shares which may be purchased upon the exercise of the Rights evidenced by this Right Certificate are subject to modification and adjustment upon the happening of certain events.

This Right Certificate is subject to all of the terms, provisions and conditions of the Agreement, which terms, provisions and conditions are hereby incorporated herein by reference

B–1

and made a part hereof and to which Agreement reference is hereby made for a full description of the rights, limitations of rights, obligations, duties and immunities hereunder of the Rights Agent, the Company and the holders of the Right Certificates. Copies of the Agreement are on file at the principal offices of the Company and the Rights Agent.

This Right Certificate, with or without other Right Certificates, upon surrender at the offices of the Rights Agent designated for such purpose, may be exchanged for another Right Certificate or Right Certificates of like tenor and date evidencing Rights entitling the holder to purchase a like aggregate number of one one–thousandths of a Preferred Share as the Rights evidenced by the Right Certificate or Right Certificates surrendered shall have entitled such holder to purchase. If this Right Certificate shall be exercised in part, the holder shall be entitled to receive upon surrender hereof another Right Certificate or Right Certificates for the number of whole Rights not exercised.

Subject to the provisions of the Agreement, the Board of Directors may, at its option, (i) redeem the Rights evidenced by this Right Certificate at a redemption price of $0.001 per Right or (ii) exchange Common Shares for the Rights evidenced by this Certificate, in whole or in part.

No fractional Preferred Shares will be issued upon the exercise of any Right or Rights evidenced hereby (other than fractions of Preferred Shares which are integral multiples of one one–thousandth of a Preferred Share, which may, at the election of the Company, be evidenced by depository receipts), but in lieu thereof a cash payment will be made, as provided in the Agreement.

No holder of this Right Certificate, as such, shall be entitled to vote or receive dividends or be deemed for any purpose the holder of the Preferred Shares or of any other securities of the Company which may at any time be issuable on the exercise hereof, nor shall anything contained in the Agreement or herein be construed to confer upon the holder hereof, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting stockholders (except as provided in the Agreement), or to receive dividends or subscription rights, or otherwise, until the Right or Rights evidenced by this Right Certificate shall have been exercised as provided in the Agreement.

If any term, provision, covenant or restriction of the Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

This Right Certificate shall not be valid or binding for any purpose until it shall have been countersigned by the Rights Agent.

B-2

WITNESS the facsimile signature of the proper officers of the Company and its corporate seal. Dated as of _____.

Attest:                                                    BALLY TOTAL FITNESS HOLDING CORPORATION

By _____          By _____

  Title:                                                      Title:

Countersigned:

LASALLE BANK NATIONAL ASSOCIATION, as Rights Agent

By _____

  Authorized Signature

                                                        B-3

[Form of Reverse Side of Right Certificate]
FORM OF ASSIGNMENT
(To be executed by the registered holder if such holder
desires to transfer the Right Certificate.)

FOR VALUE RECEIVED

hereby sells, assigns and transfers unto

(Please print name and address
of transferee)

Rights evidenced by this Right Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint _____ Attorney, to transfer the within Right Certificate on the books of the within–named Company, with full power of substitution.
Dated:

_____
Signature

Signature Guaranteed:

Signatures must be guaranteed by an "eligible guarantor institution" as defined in Rule 17Ad–15 promulgated under the Securities Exchange Act of 1934, as amended

The undersigned hereby certifies that:

(1) the Rights evidenced by this Right Certificate are not beneficially owned by and are not being assigned to an Acquiring Person or an Affiliate or an Associate thereof; and

(2) after due inquiry and to the best knowledge of the undersigned, the undersigned did not acquire the Rights evidenced by this Right Certificate from any person who is, was or subsequently became an Acquiring Person or an Affiliate or Associate thereof
Dated:

_____
Signature

B–4

## FORM OF ELECTION TO PURCHASE
(To be executed if holder desires to
exercise the Right Certificate )

To: Bally Total Fitness Holding Corporation

The undersigned hereby irrevocably elects to exercise _____ Rights represented by this Right Certificate to purchase the Preferred Shares issuable upon the exercise of such Rights (or such other securities or property of the Company or of any other Person which may be issuable upon the exercise of the Rights) and requests that certificates for such shares be issued in the name of:

(Please print name and address)


If such number of Rights shall not be all the Rights evidenced by this Right Certificate, a new Right Certificate for the balance remaining of such Rights shall be registered in the name of and delivered to:
Please insert social security
or other identifying number

(Please print name and address)


Dated:

_____
Signature

Signature Guaranteed:

Signatures must be guaranteed by an "eligible guarantor institution" as defined in Rule 17Ad-15 promulgated under the Securities Exchange Act of 1934, as amended.

B-5

The undersigned hereby certifies that:

    (1) the Rights evidenced by this Right Certificate are not beneficially owned by and are not being assigned to an Acquiring Person or an Affiliate or an Associate thereof; and

    (2) after due inquiry and to the best knowledge of the undersigned, the undersigned did not acquire the Rights evidenced by this Right Certificate from any person who is, was or subsequently became an Acquiring Person or an Affiliate or Associate thereof.

Dated: _____

_____
Signature

## NOTICE

    The signature in the foregoing Form of Assignment and Form of Election to Purchase must conform to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

    In the event the certification set forth above in the Form of Assignment or Form of Election to Purchase is not completed, the Company will deem the beneficial owner of the Rights evidenced by this Right Certificate to be an Acquiring Person or an Affiliate or Associate hereof and such Assignment or Election to Purchase will not be honored.

B-6

**EXHIBIT C**

<u>As described in the Rights Agreement, Rights which are</u>
<u>held by or have been held by an Acquiring Person or Associates</u>
<u>or Affiliates thereof (as defined in the Rights Agreement) and certain</u>
<u>transferees thereof shall become null and void and will no longer be transferable.</u>

SUMMARY OF RIGHTS TO PURCHASE
PREFERRED SHARES

On October 18, 2005 the Board of Directors of Bally Total Fitness Holding Corporation (the "<u>Company</u>") declared a dividend of one preferred share purchase right (a "<u>Right</u>") for each share of common stock, $0 01 par value (the "<u>Common Shares</u>"), of the Company outstanding at the close of business on October 31, 2005 (the "<u>Record Date</u>") As long as the Rights are attached to the Common Shares, the Company will issue one Right (subject to adjustment) with each new Common Share so that all such shares will have attached Rights When exercisable, each Right will entitle the registered holder to purchase from the Company one one–thousandth of a share of Series B Junior Participating Preferred Stock (the "<u>Preferred Shares</u>") at a price of $13.00 per one one–thousandth of a Preferred Share, subject to adjustment (the "<u>Purchase Price</u>") The description and terms of the Rights are set forth in a Rights Agreement, dated as of October 18, 2005, as the same may be amended from time to time (the "<u>Agreement</u>"), between the Company and LaSalle Bank National Association, as Rights Agent (the "<u>Rights Agent</u>")

Until the earlier to occur of (i) ten (10) days following a public announcement that a person or group of affiliated or associated persons has acquired, or obtained the right to acquire, beneficial ownership of 15% or more of the Common Shares (an "<u>Acquiring Person</u>") or (ii) ten (10) business days (or such later date as may be determined by action of the Board of Directors prior to such time as any person or group of affiliated persons becomes an Acquiring Person) following the commencement or announcement of an intention to make a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 15% or more of the Common Shares (the earlier of (i) and (ii) being called the "<u>Distribution Date</u>"), the Rights will be evidenced, with respect to any of the Common Share certificates outstanding as of the Record Date, by such Common Share certificate together with a copy of this Summary of Rights.

The Agreement provides that until the Distribution Date (or earlier redemption exchange, termination, or expiration of the Rights), the Rights will be transferred with and only with the Common Shares Until the Distribution Date (or earlier redemption or expiration of the Rights), new Common Share certificates issued after the close of business on the Record Date upon transfer or new issuance of the Common Shares will contain a notation incorporating the Agreement by reference Until the Distribution Date (or earlier redemption, exchange, termination or expiration of the Rights), the surrender for transfer of any certificates for Common Shares, with or without such notation or a copy of this Summary of Rights, will also constitute the transfer of the Rights associated with the Common Shares represented by such certificate As soon as practicable following the Distribution Date, separate certificates evidencing the Rights ("<u>Right Certificates</u>") will be mailed to holders of record of the Common

C–1

Shares as of the close of business on the Distribution Date and such separate Right Certificates alone will evidence the Rights.

The Rights are not exercisable until the Distribution Date. The Rights expire on July 15, 2006 unless the Rights are previously redeemed, exchanged or terminated or unless the continuation of the Rights is previously approved by the stockholders of the Company by a vote of the majority of the shares present and entitled to vote at a stockholders meeting prior to July 15, 2006 (the "First Meeting"). If the stockholders approve the continuation of Rights at the First Meeting, the Final Expiration Date will be October 18, 2015, subject to stockholder ratification of the Rights Plan by a vote of the majority of shares present and entitled to vote at a stockholders meeting to be held every subsequent two years no later than July 31st of the applicable year beginning in 2008.

Each Preferred Share purchasable upon exercise of the Rights will be entitled, when, as and if declared, to a dividend of 1,000 times the dividend, if any, declared per Common Share. In the event of liquidation, dissolution or winding up of the Company, the holders of the Preferred Shares will be entitled to a minimum preferential liquidation payment of $1,000 per share (plus any accrued but unpaid dividends) but will be entitled to an aggregate payment of 1,000 times the payment made per Common Share. Each Preferred Share will have 1,000 votes and will vote together with the Common Shares. Finally, in the event of any merger, consolidation or other transaction in which Common Shares are exchanged, each Preferred Share will be entitled to receive 1,000 times the amount received per Common Share. Preferred Shares will not be redeemable. These rights are protected by customary antidilution provisions. Because of the nature of the Preferred Share's dividend, liquidation and voting rights, the value of one one–thousandth of a Preferred Share purchasable upon exercise of each Right should approximate the value of one Common Share.

The Purchase Price payable, and the number of Preferred Shares or other securities or property issuable, upon exercise of the Rights are subject to adjustment from time to time to prevent dilution (i) in the event of a stock dividend on, or a subdivision, combination or reclassification of the Preferred Shares, (ii) upon the grant to holders of the Preferred Shares of certain rights or warrants to subscribe for or purchase Preferred Shares or convertible securities at less than the current market price of the Preferred Shares or (iii) upon the distribution to holders of the Preferred Shares of evidences of indebtedness, cash, securities or assets (excluding regular periodic cash dividends at a rate not in excess of 125% of the rate of the last regular periodic cash dividend theretofore paid or, in case regular periodic cash dividends have not theretofore been paid, at a rate not in excess of 50% of the average net income per share of the Company for the four quarters ended immediately prior to the payment of such dividend, or dividends payable in Preferred Shares (which dividends will be subject to the adjustment described in clause (i) above)) or of subscription rights or warrants (other than those referred to above).

In the event that a Person becomes an Acquiring Person or if the Company were the surviving corporation in a merger with an Acquiring Person or any affiliate or associate of an Acquiring Person and the Common Shares were not changed or exchanged, each holder of a Right, other than Rights that are or were acquired or beneficially owned by the Acquiring Person (which Rights will thereafter be void), will thereafter have the right to receive upon exercise that

C–2

number of Common Shares having a market value of two times the then current Purchase Price of the Right. In the event that, after a person has become an Acquiring Person, the Company were acquired in a merger or other business combination transaction or more than 50% of its assets or earning power were sold, proper provision shall be made so that each holder of a Right shall thereafter have the right to receive, upon the exercise thereof at the then current Purchase Price of the Right, that number of shares of common stock of the acquiring company which at the time of such transaction would have a market value of two times the then current Purchase Price of the Right.

At any time after a Person becomes an Acquiring Person and prior to the earlier of one of the events described in the last sentence of the previous paragraph or the acquisition by such Acquiring Person of 50% or more of the outstanding Common Shares, the Board of Directors may cause the Company to exchange the Rights (other than Rights owned by an Acquiring Person which will have become void), in whole or in part, for Common Shares at an exchange rate of one Common Share per Right (subject to adjustment).

No adjustment in the Purchase Price will be required until cumulative adjustments require an adjustment of at least 1% in such Purchase Price. No fractional Preferred Shares or Common Shares will be issued (other than fractions of Preferred Shares which are integral multiples of one one–thousandth of a Preferred Share, which may, at the election of the Company, be evidenced by depository receipts), and in lieu thereof, a payment in cash will be made based on the market price of the Preferred Shares or Common Shares on the last trading date prior to the date of exercise.

The Rights may be redeemed in whole, but not in part, at a price of $0.001 per Right (the "Redemption Price") by the Board of Directors at any time prior to the time that an Acquiring Person has become such. The redemption of the Rights may be made effective at such time, on such basis and with such conditions as the Board of Directors in its sole discretion may establish. Immediately upon any redemption of the Rights, the right to exercise the Rights will terminate and the only right of the holders of Rights will be to receive the Redemption Price.

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company beyond those as an existing stockholder, including, without limitation, the right to vote or to receive dividends.

Any of the provisions of the Agreement may be amended by the Board of Directors of the Company for so long as the Rights are then redeemable, and after the Rights are no longer redeemable, the Company may amend or supplement the Agreement in any manner that does not adversely affect the interests of the holders of the Rights (other than an Acquiring Person or an affiliate or associate of an Acquiring Person).

A copy of the Agreement has been filed with the Securities and Exchange Commission as an Exhibit to a Current Report on Form 8–K. A copy of the Agreement is available free of charge from the Company. This summary description of the Rights does not purport to be complete and is qualified in its entirety by reference to the Agreement, which is incorporated herein by reference.

C–3



Contact:

**BALLY TOTAL FITNESS**
8700 West Bryn Mawr Avenue
Chicago, IL 60631
www.ballyfitness.com
Investors: Janine Warell, (773) 864–6897
Media: Matt Messinger, (773) 864–6850

MWW GROUP
Public Relations
Carreen Winters – Tel. (201) 507–9500

# INDEPENDENT DIRECTORS OF BALLY TOTAL FITNESS ADOPT SHORT–TERM STOCKHOLDER RIGHTS PLAN

## Plan Reflects Board's Focus on Maximizing Value for All Shareholders and Provides Investors the Opportunity to Review Forthcoming Financial Information

**CHICAGO** October 18, 2005 – Bally Total Fitness Holding Corporation, (NYSE: BFT), announced today that its independent Directors have implemented a Stockholder Rights Plan designed to preserve the rights of all shareholders and to ensure investors realize the long–term value of their investment in Bally. The Board has been discussing the Rights Plan with its advisors for some time and approved its adoption subject to obtaining consent from the Company's lenders, which has now been obtained. The Rights Plan is being adopted in light of the significant accumulations of shares in recent months, and is not a response to any proposed takeover or other transaction. The adoption of the Rights Plan will not foreclose a fair acquisition bid for Bally Total Fitness or any other capital transaction, nor will it preclude any shareholder's ability to nominate directors.

Under the Company's Stockholder Rights Policy, the Rights Plan will expire if it is not approved by shareholders prior to July 15, 2006, although it can be redeemed or terminated sooner by the Company. In the interim, this plan is intended to prevent an outside party from attempting to acquire the Company or its equity at prices that may not reflect Bally's true long–term value.

The Board of Directors believes the Rights Plan will help create a level playing field, allowing all investors to make informed decisions based on greater visibility into the Company's operational and financial performance. The Rights Plan provides prudent protection and is particularly important at this time because Bally's financial statements for the first nine months of 2005, the year ended December 31, 2004 and for the prior years that are being restated, have not yet been issued. The Board of Directors believes shareholders should have and review such financial information before evaluating proposals from the Company or third parties.

**Details of the Rights Plan**

In connection with the Rights Plan, the Bally Board of Directors declared a dividend of one Preferred Share Purchase Right for each outstanding share of Bally common stock. The Rights distribution will be payable to shareholders of record on October 31, 2005. The Rights distribution is not taxable to shareholders. After a triggering event, including a person or group acquiring 15% or more of Bally's common stock, the Rights provide shareholders (excluding the

---

acquiring person) the ability to purchase one one–thousandth of a share of newly created Series B Junior Participating Preferred Stock of Bally at an exercise price of $13. The Bally Board will be entitled to redeem the Rights at $0.001 per Right at any time before a person has acquired 15% or more of the outstanding common stock.

Should a person or group acquire more than 15% of the Company's common stock, each Right will entitle its holder to purchase, at the Right's then–current exercise price and in lieu of receiving shares of preferred stock, a number of common shares of Bally having a market value at that time of twice the Right's exercise price. In the same regard, the Rights of the acquiring person or group will become void and will not be exercisable. If Bally is acquired in a merger or other business combination transaction not approved by the Board of Directors, each Right will entitle its holder to purchase, at the Right's then–current exercise price and in lieu of receiving shares of preferred stock, a number of the acquiring company's common shares having a market value at that time of twice the Right's exercise price.

The Rights Plan will terminate on July 15, 2006 unless the issuance of the Rights is ratified by Company shareholders prior to that time. The Board of Directors presently intends to submit the Rights Plan to shareholders for ratification prior to July 15, 2006, unless previously redeemed, exchanged or otherwise terminated. If the shareholders ratify the Rights at that meeting, the expiration date will be October 18, 2015, subject to shareholder ratification every subsequent two years no later than July 31st of the applicable year beginning 2008. In 2004, in connection with redeeming its 1996 rights plan, Bally agreed with shareholders to adopt a Rights Policy giving it the ability to implement a new Rights Plan without prior shareholder approval if the independent Directors on the Board determine the delay attendant to prior shareholder approval of the Rights Plan is not in the best interests of the Company's shareholders and the Rights Plan is submitted to a vote of shareholders on the later of its next annual meeting date or 270 days after adoption.

**About Bally Total Fitness**

Bally Total Fitness is the largest and only nationwide commercial operator of fitness centers in the U.S., with approximately four million members and nearly 440 facilities located in 29 states, Mexico, Canada, Korea, China and the Caribbean under the Bally Total Fitness(R), Crunch Fitness(SM), Gorilla Sports(SM), Pinnacle Fitness(R), Bally Sports Clubs(R) and Sports Clubs of Canada (R) brands. With an estimated 150 million annual visits to its clubs, Bally offers a unique platform for distribution of a wide range of products and services targeted to active, fitness–conscious adult consumers.

*Forward-looking statements in this release including, without limitation, statements relating to the Company's plans, strategies, objectives, expectations, intentions, and adequacy of resources, are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements involve known and unknown risks, uncertainties, and other factors that may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors include, among others, the following: the possible accumulation of additional shares by existing significant shareholders or by others; other efforts by existing shareholders or others to gain influence or control over Bally; existing or other potential litigation initiated by shareholders or others; possible litigation by Bally if shareholders or others make proposals or statements which Bally does not believe to be fair or accurate or in the best interests of its other shareholders; the completion and audit of Bally's 2004 financial statements and the completion of Bally's financial statements for the first and second quarters of 2005, including the effect of this or any further delays, and other factors described in prior filings of the Company with the Securities and Exchange Commission.*

# # #

Created by 10KWizard Technology    www.10KWizard.com

# EXHIBIT 31



# FORM 8–K

## BALLY TOTAL FITNESS HOLDING CORP – BFT

**Filed: December 01, 2005 (period: November 30, 2005)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 2.02** Results of Operations and Financial Condition

**Item 9.01** Financial Statements and Exhibits

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C.
# FORM 8-K
### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934
Date of Report (Date of Earliest Event Reported): November 30, 2005

# BALLY TOTAL FITNESS HOLDING CORPORATION
(Exact name of registrant as specified in its charter)
Commission file number: 001-13997

| Delaware | 36-3228107 |
|---|---|
| (State or other jurisdiction of incorporation) | (I R S. Employer Identification No ) |
| 8700 West Bryn Mawr Avenue, Chicago, Illinois | 60631 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:      (773) 380-3000

N/A
(Former name or former address, if changed since last report )

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230 425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240 14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240 13e-4(c))

Table of Contents

## TABLE OF CONTENTS

Item 2.02 Results of Operations and Financial Condition.
Item 9.01 Financial Statements and Exhibits
 Press Release

Table of Contents

BALLY TOTAL FITNESS HOLDING CORPORATION
FORM 8–K
Current Report

**Item 2.02    Results of Operations and Financial Condition**

On November 30, 2005, Bally Total Fitness Holding Corporation (the "Company") issued a press release announcing results for the nine months ended September 30, 2005 and fiscal 2004 and completed restatement of results for fiscal years 2000 to 2003 The press release is attached hereto as Exhibit 99.1

**Item 9.01    Financial Statements and Exhibits**

(c)    Exhibits

99 1    Press release dated November 30, 2005 announcing results for the nine months ended September 30, 2005 and fiscal 2004 and completed restatement of results for fiscal years 2000 to 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned hereunto duly authorized

BALLY TOTAL FITNESS HOLDING
CORPORATION
Registrant

Dated: November 30, 2005

/s/ Marc D. Bassewitz
Marc D. Bassewitz
Senior Vice President, Secretary and General
Counsel

Exhibit 99.1

( BW)(IL–BALLY–TOTAL–FITNESS)(BFT) Bally Total Fitness Announces Financial Results for First Nine Months 2005, Year–End 2004; Completes Restatement of 2000 Through 2003 Results

Business Editors

CHICAGO—(BUSINESS WIRE)—Nov 30, 2005—Bally Total Fitness Corporation (NYSE:BFT):

Strategic Transformation Initiatives, Cost Containment Programs Drive Growth in Revenue, Operating Income

— Company Posts Nine–Month $1 8 Million Net Profit Vs. 2004 and 2003 Losses

— Nine Month 2005 Operating Income Before Impairment Charges Up $25 3 Million, 70 Percent, From 2004

— 2004 Operating Income Before Impairment Charges Up $18 2 Million, 52 Percent, From Restated 2003

— 2004 Net Loss of $30 3 million Vs. 2003 Restated Net Loss of $106 0 million

— 2005 New Member Joins Up 4 4 Percent; Total Members Down 1 Percent

— 2004 Record New Member Joins Up 21 Percent Over Prior Year

Bally Total Fitness Corporation (NYSE:BFT) the leading operator and provider of health and fitness clubs, products and services, today announced financial results for the nine months ended September 30, 2005 and the year–ended December 31, 2004. The Company also completed restatements for years 2000 through 2003. With today's filings, Bally is current with its federal securities filing and bond indenture requirements.

Paul Toback, Chairman and Chief Executive officer, said, "Our financial results for the past 21 months reflect our monumental undertaking in literally transforming our entire company, including putting a new management team in place, revamping our financial organization, changing our accounting, implementing strategic initiatives and creating and introducing a new business model that we believe should continue to improve the financial performance and returns of Bally Total Fitness.

"We're also gratified to have completed the arduous and demanding task of restating our financial results. I specifically want to thank our employees, whose focus, energy and time were taxed with this burden, yet they never took their focus off our primary goal of ensuring the continued improvement of operations in order to enhance shareholder value."

Mr. Toback added, "We're pleased that results for the first nine months of 2005 and the year–end 2004 show revenue and operating income improvement. These results reflect the initial impact of our growth initiatives — including new membership sales strategies such as our Build Your Own Membership Plan and our Family–add–on program, further emphasis on add–on services such as personal training, and a renewed focus on customer service to improve member retention — as well as stricter expense management."

---

Nine–Month 2005 Financial Results

For the first nine months of 2005, net revenues were up 2.3 percent to $807.5 million, compared with $789.3 million for the same period in 2004. The increase was driven by a 2 percent increase in average monthly revenue recognized per member to $19 70 in the 2005 period. A 4 percent increase in personal training revenue also contributed to the improvement in revenues

For the 2005 nine–month period, operating income grew 70 percent to $61 7 million compared with the 2004 period operating income of $36 4 million, reflecting the Company's continued focus on revenue growth and expense management. For same period, operating expenses as a percentage of revenues were down 3 percent, primarily at the club level, compared with 2004. The operating income growth occurred despite an increase in general and administrative expenses of $9 9 million that included a $6 million charge related to the accelerated vesting of 1 6 million shares of restricted stock resulting from a change of control under the Company's 1996 Long–Term Incentive and Inducement Plans. Because the Company has been in a quiet period resulting from not filing financial statements since May 2004, it is now possible that some members of management may decide to sell certain holdings of Company stock in connection with personal tax planning or diversification determinations.

The Company reported net income of $1 8 million, or $0 05 per share, for the nine months ended September 30, 2005 versus net losses of $13.3 million and $19 6 million, or a loss of $0.40 and $0 60 per share, for 2004 and 2003, respectively

For the nine months ended September 30, 2005, new joining members were up 4.4 percent compared to the prior year period. The total number of members at September 30, 2005 was 3.676 million, down less than 1 percent from the prior year, reflecting a growing percentage of new members joining on a pay–as–you–go basis and the lower retention rate of those members. This member count and comparison to the prior year reflects the Company's current definition of membership, which includes members whose balances are past due by up to 90 days. The Company's previous definition included past due accounts of up to 180 days. The current definition reflects the results of management's analysis to better understand collection trends by member classification. These results indicated that members with accounts more than 90 days past due were not likely to become current and are therefore excluded from our member statistics.

Third–Quarter 2005 Financial Results

For the third quarter ended September 30, 2005, net revenues were $261 8 million, down slightly from $264.8 million a year ago, primarily as a result of a 2 percent decline in membership revenue based on a 1 percent decrease in the average number of members in the 2005 quarter, as well as a 1 percent decrease in average revenue per member. This was offset, in part, by continued growth in personal training revenue, up 6 percent in the quarter, versus the same period a year ago

Operating income for the third quarter was $18 8 million versus $23 0 million in 2004, primarily reflecting write–downs of retail inventory increased, information technology expenses, and an increase

of $3.0 million in costs incurred in connection with the restatements and related investigations and litigation. Membership services expense continued on a positive trend, down 1.5 percent from 2004. The company reported a net loss for the quarter of $1.6 million, or a loss of $0.05 per share, compared with net income of $6.8 million, or $0.21 per share in 2004.

Commenting on the quarter, Mr. Toback said, "Our stringent focus on cost management in the third quarter was, unfortunately, more than offset by a number of costs associated with investing in information technology upgrades and all of the costs associated with restating our financials and complying with the Sarbanes–Oxley Act. Flat revenue for the period reflects the transitional effects on our business model of our new initiatives. However, we believe as our new marketing campaign kicks off and improved service takes hold throughout the clubs, customer satisfaction and retention will improve, as will customer referrals from existing members, driving future revenue growth and, ultimately, greater profitability."

Mr. Toback continued, "While total membership is up only slightly from the beginning of the year, we're encouraged by early indications of our new initiatives, which we believe are beginning to gain traction. Our consumer–friendly Build Your Own Membership program was introduced in smaller markets during the first half of the year, with rollout in larger markets, such as Chicago, Los Angeles, and New York, from August through October. As a result, the expected impact of this new initiative in our largest markets is not yet reflected in these numbers. Improving our membership retention is a top priority and we remain squarely focused on initiatives to achieve this goal."

Cash and Liquidity

As of November 30, 2005, Bally had $40 million of borrowings and $13.9 million in letters of credit outstanding under its $100 million revolving credit facility. As of September 30, 2005, Bally had $20 million of borrowings and $13.9 million in letters of credit issued under its $100 million revolving credit facility.

Beginning in August 2005, the Company drew more heavily on its revolving credit facility. This utilization is primarily related to the $14.9 million payment arising out of an arbitration dispute with Household Credit, $8.0 million paid for consents to bondholders and banks relating to extending financial reporting deadlines, $3.5 million paid to professional advisors in connection with the restatements, and the October 17, 2005 interest payment on the 9 7/8% Senior Subordinated Notes.

2004 Vs. Restated 2003 Financial Results

For the year ended December 31, 2004, net revenues, bolstered by record memberships sold and record personal training revenue, were $1,048.0 million, up 4.5 percent, compared with restated net revenues of $1,002.9 million in 2003, which included a one–time revenue increase of $11 million from the sales of written–off accounts. During 2004, average monthly membership revenue recognized per member was relatively stable at $19.17 versus $19.11 in the prior–year period. The average number of monthly members grew 2 percent to 3.697 million, compared with 3.622 million average monthly members in 2003. The Company also saw a significant increase in personal training revenue, up 26 percent.

Operating income in 2004 was $38 2 million, up $77 1 million from a 2003 restated operating loss of $38 9 million  The operating income improvement is the result of the aforementioned $45 1 million increase in revenue as well as a $58 9 million decrease in impairment charges against long–lived assets and goodwill

Also, in 2004 operating income before non–cash impairment charges of $15 2 million was $53 4 million, up 52 percent compared with the prior year  Impairment charges of $74.1 million in 2003 were primarily related to the Company's Crunch Fitness division acquired in December 2001  The Company believes this non–GAAP financial metric more accurately reflects results of operations in 2004 compared to the prior year because of the significant non–cash impairment charges that occurred in 2003. The Company reported a lower net loss of $30 3 million, or $0 92 per share, for the year–end 2004 compared with a restated 2003 net loss of $106.0 million, or $3 24 per share

In 2004, the Company had record numbers of new joining members, up 21 percent compared with 2003. New memberships sold in 2004 were also significantly higher, up 6 3 percent versus 2003  The total number of members at year–end 2004 was 3 645 million versus 3 616 million in 2003, with both member counts now reflecting the stricter delinquency period for inclusion, as explained earlier

Strategic Initiative

The Company also announced today its Board of Directors has retained J P  Morgan Securities Inc ., to explore a range of strategic alternatives to enhance shareholder value  Such alternatives may include, but are not limited to, a recapitalization, the sale of securities or assets of the Company or the sale or merger of Bally Total Fitness with another entity or strategic partner  J P. Morgan Securities Inc., will work in collaboration with The Blackstone Group, which has been advising Bally for the past 10 months, in providing strategic advisory services to the Company  Bally Total Fitness said there can be no assurances that any transaction will occur

Restated 2003 and 2002 Results

The Company also completed its restatement of historical results for years 2000 through 2003, which reflects the correction of numerous errors in our previous financial accounting and reporting  The more than two dozen restatement items included corrections related to the recognition of revenue, valuation adjustments of long–lived assets and goodwill and other intangible assets, lease accounting and income taxes.

These restatement adjustments resulted in an increase in previously reported net loss of approximately $96.4 million for the year ended December 31, 2002 and a decrease of $540 million in net loss for the year ended December 31, 2003  The decrease in 2003 reported net loss includes the reversal of the cumulative effect of a change in accounting previously reported in 2003 of $581 million. The Company also increased the January 1, 2002 opening accumulated stockholders' deficit by $1 7 billion to recognize the effects of corrections in financial statements prior to 2002

For a comparison of restated and previously reported results, see the Company's Annual Report on Form 10–K, which has been filed with the SEC  It can also be viewed on Bally's website at www ballytotalfitness com

About Bally Total Fitness

Bally Total Fitness is the largest and only nationwide commercial operator of fitness centers in the U S , with nearly 440 facilities located in 29 states, Mexico, Canada, Korea, China and the Caribbean under the Bally Total Fitness(R), Crunch Fitness(SM), Gorilla Sports(SM), Pinnacle Fitness(R), Bally Sports Clubs(R) and Sports Clubs of Canada(R) brands  Bally offers a unique platform for distribution of a wide range of products and services targeted to active, fitness–conscious adult consumers.

Safe Harbor Statement

Forward–looking statements in this release including, without limitation, statements relating to the Company's plans, strategies, objectives, expectations, intentions, and adequacy of resources, are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward–looking statements involve known and unknown risks, uncertainties, and other factors that may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward–looking statements. These factors include, among others, the following: the outcome of the SEC and Department of Justice investigations; the communication by Bally's management and independent auditors of the existence of material weaknesses in internal controls over financial reporting; general economic and business conditions; competition; success of operating initiatives, advertising and promotional efforts; existence of adverse publicity or litigation (including various shareholder litigations) and the outcome thereof and the costs and expenses associated therewith; acceptance of new product and service offerings; changes in business strategy or plans; availability, terms and development of capital; business abilities and judgment of personnel; changes in, or the failure to comply with, government regulations; ability to remain in compliance with, or obtain waivers under, the Company's loan agreements and indentures; the ability to maintain existing or obtain new sources of financing, on acceptable terms or at all, to satisfy the Company's cash needs and obligations; and other factors described in filings of the Company with the Securities and Exchange Commission

Bally Total Fitness Holding Corporation
Financial Highlights

Note: The following is a summary of financial data provided in the Company's Annual Report on Form 10–K for the year ended
December 31, 2004 and Form 10–Q for the period ended September 30, 2005  Please refer to these filed documents for a complete
explanation of the Company's current results and restatements for 2000 through 2003

| | Nine months ended September 30, | | Year ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2004 | 2003 |
| | (in thousands, except per share, per member and number of fitness centers data) | | | |
| Net revenues | | | | |
| Membership | $657,540 | $638,974 | $  850,541 | $  830,511 |
| Personal training | 97,034 | 93,559 | ·125,441 | 99,355 |
| Membership services revenue | 754,574 | 732,533 | 975,982 | 929,866 |
| Retail products | 40,251 | 42,048 | 53,340 | 55,266 |
| Miscellaneous | 12,664 | 14,720 | 18,666 | 17,739 |
| Net revenues | 807,489 | 789,301 | 1,047,988 | 1,002,871 |
| Operating costs and expenses | | | | |
| Membership services | 546,195 | 561,057 | 732,741 | 726,231 |
| Retail products | 40,561 | 40,399 | 54,496 | 57,493 |
| Advertising | 45,795 | 49,352 | 61,602 | 53,503 |
| Information technology | 17,373 | 14,256 | 18,288 | 12,507 |
| Other general and administrative | 45,471 | 35,601 | 57,689 | 41,139 |
| Depreciation and amortization | 50,397 | 52,232 | 69,779 | 76,767 |
| | 745,792 | 752,897 | 994,595 | 967,640 |
| Operating income before impairment charges | 61,697 | 36,404 | 53,393 | 35,231 |
| Impairment of goodwill and other intangibles | | | 405 | 54,505 |
| Asset impairment charges | | | 14,772 | 19,605 |
| Operating income (loss) | 61,697 | 36,404 | 38,216 | (38,879) |
| Other income (expense) | | | | |
| Interest expense, net | (60,588) | (49,266) | (67,201) | (62,585) |
| Foreign exchange gain (loss) | 1,187 | 473 | 1,578 | 2,371 |
| Other, net | 272 | (232) | (1,998) | (2,479) |
| | (59,129) | (49,025) | (67,621) | (62,693) |
| Income (loss) from continuing operations before income taxes | 2,568 | (12,621) | (29,405) | (101,572) |
| Income tax provision | 776 | 638 | 851 | 1,102 |
| Income (loss) from continuing operations | 1,792 | (13,259) | (30,256) | (102,674) |
| Discontinued operations | | | | |
| Loss from discontinued operations | | | | (981) |
| Loss on disposal | | | | (1,699) |
| Loss from discontinued operations | — | — | — | (2,680) |
| Income (loss) before cumulative effect of change in accounting principles | 1,792 | (13,259) | (30,256) | (105,354) |
| Cumulative effect of change in accounting principle | | | | (626) |
| Net income (loss) | $   1,792 | $ (13,259) | $  (30,256) | $ (105,980) |
| Net income (loss) per common share | $   0 05 | $  (0 40) | $   (0 92) | $  (3 24) |
| Summary cash flow data | | | | |
| Cash provided by operating activities | $ 22,448 | $ 39,017 | $  36,124 | $  89,877 |
| Cash used in investing activities | $ (23,193) | $ (38,678) | $ (50,241) | $ (48,211) |
| Cash provided by (used in) financing activities | $  (6,030) | $ 10,582 | $  19,223 | $ (38,142) |

| | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|
| Operating data Average monthly membership revenue recognized per member | $ | 19 70 | $ | 19 17 | $ | 19.17 | $ 19.11 |
| Average number of members during the period | | 3,708 | | 3,704 | | 3,697 | 3,622 |
| Number of members at end of period | | 3,676 | | 3,708 | | 3,645 | 3,616 |
| Number of members joined during the period | | 951 | | 911 | | 1,165 | 965 |
| Fitness centers operating at end of period | | 412 | | 414 | | 416 | 417 |

## BALLY TOTAL FITNESS HOLDING CORPORATION
### Condensed Consolidated Balance Sheets
(In thousands)

| | September 30 2005 (Unaudited) | December 31 2004 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 12,763 | $ 19,177 |
| Deferred income taxes 471 Other current assets | 33,975 | 30,239 |
| Total current assets | $ 46,738 | $ 49,887 |
| Property and equipment, less accumulated depreciation and amortization of $754,599 and $713,222 | 335,217 | 361,863 |
| Goodwill, net | 41,732 | 41,698 |
| Intangible assets, less accumulated amortization of $22,759 and $21,565 | 9,537 | 9,933 |
| Other assets | 6,706 | 7,909 |
| | 46,165 | 28,279 |
| | $ 486,095 | $ 499,569 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities | | |
| Accounts payable | $ 47,425 | $ 51,373 |
| Income taxes payable | 1,702 | 1,399 |
| Deferred income taxes | 681 | — |
| Accrued liabilities | 97,351 | 111,226 |
| Current maturities of long–term debt | 15,707 | 22,127 |
| Deferred revenues | 325,403 | 323,271 |
| Total current liabilities | 488,269 | 509,396 |
| Long–term debt, less current maturities | 743,816 | 737,432 |
| Deferred rent liability | 102,874 | 101,911 |
| Deferred income taxes | 800 | 1,637 |
| Other liabilities | 29,940 | 21,580 |
| Deferred revenues | 583,786 | 601,889 |
| Total liabilities | 1,949,485 | 1,973,845 |
| Stockholders' equity (deficit) | (1,463,390) | (1,474,276) |
| | $ 486,095 | $ 499,569 |

—30—

CONTACT:    Bally Total Fitness Corporation
            Janine Warell (Investors), 773–864–6897
            or
            Matt Messinger (Media), 773–864–6850
            www.ballyfitness com

Created by 10KWizard Technology   www.10KWizard.com