IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BALLY TOTAL FITNESS HOLDING CORP. | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-841-JJF |
| v. | ) | |
| | ) | |
| LIBERATION INVESTMENTS, L.P., | ) | |
| LIBERATION INVESTMENTS, LTD., | ) | |
| LIBERATION INVESTMENT GROUP | ) | |
| LLC and EMANUEL R. PEARLMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT A
TO
THE DEFENDANTS' REPLY IN FURTHER
SUPPORT OF THEIR MOTION TO DISMISS THE
PRELIMINARY INJUNCTION PROCEEDING AS MOOT**

Westlaw.

Not Reported in F.Supp.2d                                                                                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
(Cite as: 2000 WL 33115906 (S.D.N.Y.))

C

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
RANGER OIL LTD.
v.
PETROBANK ENERGY AND RESOURCES LTD., et al.
No. 00CIV3139SHS.

May 23, 2000.

Charles A. Gilman, Kevin J. Burke and Joel Kurtzberg, Cahill, Gordon & Reindel, New York, New York, for the plaintiff.

William McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York, New York, for the defendants.

Opinion

STEIN, J.

*1 Exchange Act-Tender Offers-Preliminary Injunctions.-A federal court declined to preliminarily enjoin a tender offer because of alleged violations of the tender offer rules. The target company failed to demonstrate that it or its shareholders would suffer irreparable harm if the tender offer proceeded. Any losses suffered as a result of these alleged violations could be compensated by money damages awarded in the securities fraud suit.

See ¶ 24,297, "Exchange Act-Proxies" division, Volume 3.

Plaintiff Ranger Oil Limited brought this action alleging violations of the federal securities laws by defendants Petrobank Energy and Resources Ltd., Petrobank Acquisition Inc., the Caribou Offshore Fund, Caribou Partners Fund, Caribou Capital Corp., John D. Wright, M. Bruce Chernoff, and Does 1-10. In particular, Ranger alleges that defendants violated 15 U.S.C. §§ 78m (d) and 78n(e) and 17 C.F.R. § 240.14e-3 by failing adequately to disclose material information and to refrain from insider trading in the context of a tender offer by defendants for outstanding stock of Ranger. Simultaneous with the filing of the complaint, Ranger moved for a preliminary injunction to enjoin defendants from proceeding with the tender offer.

After receiving evidence and legal memoranda as well as hearing oral argument on May 17, and due consideration having been given, this Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) on plaintiff's motion for a preliminary injunction:

FINDINGS OF FACT

The Parties

1. Plaintiff Ranger Oil Limited is a Canadian company with its primary office in Calgary, Alberta. Ranger's shares are listed for trading on the Toronto Stock Exchange, the New York Stock Exchange, the Pacific Exchange, and the London Stock Exchange. See Amended Complaint P 6; Answer P 6. As of March 31, 2000, approximately 47% of the Ranger shares "were held in the United States." Aff. of J. Michael D'Aguiar, dated Apr. 25, 2000, P 7.

2. Defendant Petrobank Acquisition, Inc. is a Canadian company with its primary office in Calgary, Alberta. It was organized for the purpose of making the tender offer and has not engaged in any activities other than those incidental to its organization and the making of the tender offer. See Amended Complaint P 7; Answer P 7.

3. Defendant Petrobank Energy and Resources Ltd. ("Petrobank," and collectively with Petrobank Acquisition, the "Petrobank defendants") is a Canadian company with its primary office in Calgary, Alberta. Petrobank holds itself out to be an oil and natural gas exploration and production company. See Amended Complaint P 8; Answer P 8. Petrobank's common shares are listed for trading on the Toronto Stock Exchange. See Aff. of Charles A. Gilman, dated May 8, 2000, Ex. 1, at i.

4. Defendant Caribou Offshore Fund ("Caribou Offshore") is an offshore Bermuda trust and private investment fund. See Amended Complaint P 9; Answer P 9. Caribou Offshore's activities include investing in and trading securities of privately and publicly traded companies, and investing in and trading oil and gas. Neither Caribou Capital Corp. nor any employee or affiliate of it owns any interest

Case 1:05-cv-00841-JJF    Document 43-2    Filed 12/19/2005    Page 3 of 10

Not Reported in F.Supp.2d                                                                                     Page 2
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
**(Cite as: 2000 WL 33115906 (S.D.N.Y.))**

in Caribou Offshore. Current unitholders in Caribou Offshore are foreign, privately-held corporations that deal at arm's length with defendant Caribou Capital Corp. and its associates and affiliates. See Decl. of Barry Sher, dated May 16, 2000, Ex. 1, at 10.

*2 5. Defendant Caribou Partners Fund ("Caribou Partners") is a private investment fund governed by a Fund Management Agreement finalized on March 1, 2000, among Caribou Capital Corp. and the unitholders of the fund. See Amended Complaint P 10; Answer P 10. Defendants John D. Wright and M. Bruce Chernoff are unitholders who control a combined interest of approximately 96% of Caribou Partners. See Sher Decl., Ex. 1, at 10.

6. Defendant Caribou Capital Corp. ("Caribou Capital," and collectively with Caribou Offshore and Caribou Partners, the "Caribou defendants") is a Canadian company with its primary office in Calgary, Alberta. Caribou Capital is controlled by defendants John D. Wright and M. Bruce Chernoff. See Amended Complaint P 11; Answer P 11. Caribou Capital's sole shareholder is defendant M. Bruce Chernoff, and its board of directors consists of John D. Wright, M. Bruce Chernoff, and two other persons. Caribou Capital provides management services to and has complete discretion over the investments, acquisitions, and dispositions of Caribou Partners and Caribou Offshore, and thereby has the sole power to direct the disposition and voting of any Ranger shares held by Caribou Partners and Caribou Offshore. See Sher Decl., Ex. 1, at 10.

7. Defendant John D. Wright resides in Calgary, Alberta. Wright is President and Chief Executive Officer of Petrobank, President and director of Acquisition, and a director of Caribou Capital. See Amended Complaint P 12; Answer P 12; Aff. of John D. Wright, dated May 8, 2000, P 1.

8. Defendant M. Bruce Chernoff resides in Calgary, Alberta. Chernoff is Executive Vice President and Chief Financial Officer and a director of Petrobank, Secretary and a Director of Acquisition, and President of Caribou Capital. See Amended Complaint P 13; Answer P 13; Aff. of M. Bruce Chernoff, dated May 8, 2000, P 1.

9. Defendants Does 1-10 are unitholders in Caribou Offshore whose identities are unknown to Ranger. See Amended Complaint P 14; Answer P 14.

The Litigation

10. On April 25, 2000, Ranger filed this action in the U.S. District Court for the Southern District of New York. Simultaneously, Ranger filed a motion for a preliminary injunction seeking to restrain defendants from proceeding with the tender offer, which at that time was scheduled to close on Friday, May 12, 2000. As is customary in tender offer litigation, events unfolded rapidly. Extensive discovery proceedings took place.

11. Then, on May 9, 2000, Ranger filed an Amended and Supplemental Complaint. Count V alleges that on April 6, 2000, Petrobank commenced a tender offer for all outstanding shares of Ranger. Count VI alleges that the Caribou defendants, Wright, and Chernoff engaged in insider trading in connection with the tender offer, in violation of § 14(e) of the Securities Exchange Act of 1934 ("Act"), _15 U.S.C. § 78n (e)_, and Securities and Exchange Commission ("SEC") Rule 14e-3, _17 C.F.R. § 240.14e-3_. Count VII alleges that Petrobank, Wright, and Chernoff made materially false and misleading statements and omissions of material fact with respect to the terms and conditions of the tender offer in the Schedule 14D-1F disclosure filed with the SEC pursuant to SEC Rule 14d-1 on April 6, 2000, in violation of § 14(e) of the Act, _15 U.S .C. § 78n (e)_. Count VIII alleges that Petrobank and Caribou Capital made materially false and misleading statements and omissions of material fact with respect to the source of funds for Ranger share purchases in the Schedule 13D disclosure filed with the SEC on April 4, 2000, in violation of § 13(d) of the Act, _15 U.S.C. § 78m (d)_.

*3 12. Apparently in response to the allegations in the amended complaint that there had been a failure to disclose material facts, on May 11, 2000, the Petrobank defendants amended the disclosures made in connection with the tender offer by filing a Notice of Variation and Extension of the Offer to Purchase ("Notice"). The Notice made a variety of additional disclosures, annexed a copy of the amended complaint in this action, and extended the tender offer; it currently expires at 11:00 p.m. MPT (_i.e.,_ Calgary time) on Monday, June 5, 2000. See Sher Decl., Ex. 1, at 1.

13. On May 17, 2000, defendants filed an Answer to the amended complaint.

14. On that same day, a hearing was held before this Court at which the parties presented arguments based on prior evidentiary submissions in connection with Ranger's motion for a preliminary injunction. At the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00841-JJF    Document 43-2    Filed 12/19/2005    Page 4 of 10

Not Reported in F.Supp.2d    Page 3
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
(Cite as: 2000 WL 33115906 (S.D.N.Y.))

hearing, the parties agreed that the Notice filed on May 11, 2000, cured the disclosure violations alleged in Counts VII and VIII of the amended complaint, with the exception that Ranger asserts that the failure to disclose the alleged insider trading violations itself violates § 14(e) of the Act, 15 U.S.C. § 78n (e). See Transcript of May 17 hearing ("Tr."), at 5-6.

15. Pursuant to Count VI of the amended complaint, Ranger presently maintains that in February 2000 Caribou Capital took substantial steps to commence a tender offer for Ranger and that subsequent purchases of Ranger shares by Caribou Offshore and Caribou Partners, effectuated by Caribou Capital on the basis of its inside knowledge of the impending tender offer, constituted illegal insider trading in violation of § 14(e) of the Act and SEC Rule 14e-3.

16. In essence, due to the filing of the new disclosure statement--the Notice--on May 11, the gravamen of this litigation has shifted from allegations of disclosure violations to allegations of insider trading. See Tr. at 5-6.

17. Section 14(e) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n (e).

18. SEC Rule 14e-3, promulgated pursuant to § 14(e) of the Act, provides in pertinent part:

(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

*4 (1) The offering person,

(2) The issuer of the securities sought or to be sought by such tender offer, or

(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e-3(a).

The Tender Offer

19. In September 1999, Ranger embarked on a formal process of reviewing possible strategic alternatives to enhance shareholder value. See Dyment Dep. at 41-43; Reisman Dep. at 21-24; Sloan Dep. at 11-13.

20. In January 2000, Ranger hired financial advisors for the purpose of exploring and pursuing strategic alternatives. See MacAvoy Decl., Ex. 5; Dyment Dep. at 46-49, 106-07, 169-73; Reisman Dep. at 44-45; Davies Dep. at 12.

21. Between January and March 2000, Ranger and its advisors engaged in merger discussions with at least two corporations. Dyment Dep. at 56-58, 173-75; Sloan Dep. at 20-27; Davies Dep. at 12, 17-27.

22. In January 2000, Wright and Chernoff identified Ranger as "an attractive, undervalued investment." Wright Aff. P 5.

23. Beginning on January 18 and ending on January 28, 2000, purchases of over 3 million Ranger shares were credited to Caribou Offshore's account. On January 25, 2000, Caribou Offshore sold 20,000 Ranger shares. See Sher Decl., Ex. 1, at 11-12.

24. On February 2, 2000, Wright and Chernoff, acting on behalf of Caribou Capital, contacted the investment banking firm Griffiths McBurney & Partners ("Griffiths McBurney") to discuss investment options with respect to Ranger. See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
**(Cite as: 2000 WL 33115906 (S.D.N.Y.))**

Wright Dep. at 40-43; Chernoff Dep. at 104-06. Caribou Capital's contact at Griffiths McBurney was Thomas A. Budd. See Wright Aff. PP 11-13.

25. On February 8, 2000, Budd sent Wright a letter containing a draft engagement agreement between Griffiths McBurney and Caribou Capital. See Gilman Aff., Ex. 11, at DW-2. That letter states that Griffiths McBurney will, among other duties:

(ii) handle all communications with the shareholders of Ranger until such time as the shareholders' meeting is held or a sale, merger or any other business combination of Ranger occurs;

....

(v) if appropriate, develop strategies to possibly initiate a hostile bid of [Ranger] and, in certain instances, attempt to have any hostile bid increased; [and]

....

(viii) assist in the evaluation of Ranger, and all merger or other business combination proposals arising from other sources.

Id. at DW-3.

26. In early February, Wright happened to meet an old friend, Ken McKinnon, Vice President and Chief Financial Officer of Petrobank. See Wright Dep. at 16- 17; Wright Aff. PP 22-23.

*5 27. On February 11, 2000, Wright met with Petrobank representatives to discuss the oil industry and the strategic outlooks of their respective corporations. See Wright Dep. at 1819; Tocher Dep. at 21-26.

28. On or about February 18, Wright and Chernoff contacted Barclays Bank PLC to discuss "whether Barclays would fund hostile bids generally and ... whether Barclays would finance the debt for a bid for Ranger by Caribou." Wright Aff. P 8; see Wright Dep. at 75.

29. On February 15, 19, and 23, Wright and Chernoff met with Petrobank executives to discuss the possibility of Caribou Capital's investment in and management of Petrobank. See Wright Dep. at 22-28; Tocher Dep. at 90-91.

30. On February 22, Wright and Chernoff approached Fred Dyment, Chief Executive Officer of Ranger, and discussed Ranger's business situation, management philosophy, and strategic outlook. See Dyment Dep. at 61; Wright Dep. at 178-79; Chernoff Dep. at 196-204; see also Gilman Aff., Ex. 11, at DW-312 to -313.

31. On February 23, Wright executed a confidentiality agreement on behalf of Caribou Capital with Petrobank so that Petrobank could provide Caribou Capital with confidential information regarding its operations and corporate activities. See Gilman Aff., Ex. 11, at DW1132. The agreement omitted a provision from earlier drafts that had stated, "Recipient will be bound by the terms and conditions of Petrobank's stock trading policy, as may be amended from time to time." Id. at DW-245 to -248. According to Kevin L. Adair, VicePresident for Petrobank, Petrobank's stock trading policy "essentially provides that people with non-public information or undisclosed information are prohibited from trading in the company's [i.e., Petrobank's] stock." Adair Dep. at 25; see also Tr. at 24-27.

32. On February 23, James Tocher, a significant shareholder and former Chief Executive Officer of Petrobank, signed a confidentiality or "tippee" letter addressed to him from Chernoff that stated:

In order to consider advancing a potential transaction between us we will be disclosing to you some highly confidential and sensitive information concerning another public company. By your acknowledgment hereof you agree that you will hold such information on a completely confidential basis and not use it for any purpose other than evaluating the possible transaction between us and will not disclose it to any other person without our prior written consent and then only if such other person agrees to be bound by the provisions of this letter. You also acknowledge that upon receipt of such information you will become an "insider" or "tippee" for securities purposes and that you will not conduct, and you are legally prohibited from conducting, any trading activity in the securities of the subject public company.

Gilman Aff., Ex. 11, at DW-252; Tocher Dep. at 102-06; Wright Dep. at 52-53. After Tocher signed the letter, Wright and Chernoff informed him about Caribou's interest in Ranger. See Tocher Dep. at 50.

*6 33. On February 24 and 25, the Petrobank board held a two-day meeting that was devoted, among other topics, to discussion of the possible investment in Petrobank by Caribou. On February 25, Wright and Chernoff made a presentation to the Board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00841-JJF   Document 43-2   Filed 12/19/2005   Page 6 of 10

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
**(Cite as: 2000 WL 33115906 (S.D.N.Y.))**

regarding their vision for Petrobank, including their plans to acquire Ranger, which they had code-named "Typhoon." See Wright Dep. at 58-67.

34. On February 25, the Petrobank board approved resolutions that:

1. The Corporation [i.e., Petrobank] negotiate an Agreement with Caribou Capital to have Caribou Capital invest equity capital in the corporation and provide management services in an executive and consulting basis....

2. The Corporation will support the program which Caribou intends to initiate to take action to acquire "Typhoon."

MacAvoy Decl., Ex. 2, at 4.

35. On February 25, Martin A. Lambert of the law firm Bennett Jones sent Chernoff and Wright an engagement letter stating, "Further to our recent discussions, this is to confirm that we will represent you in your proposed transaction with Ranger." Gilman Aff., Ex. 11, at DW-1199.

36. Beginning on February 18 and ending on February 25, purchases of approximately 1.7 million Ranger shares were credited to Caribou Offshore's account, and purchases of 22,000 Ranger shares were credited to Caribou Partners' account. See Sher Decl., Ex. 1, at 11-12.

37. On March 9, Caribou Capital and Petrobank reached an agreement pursuant to which Caribou Capital would invest in Petrobank and Wright and Chernoff would hold management positions in Petrobank. See Wright Dep. at 12-13; Wright Aff. P 55.

38. On March 14, the March 9 agreement received shareholder approval. See Wright Dep. at 12-13; Wright Aff. P 55.

39. On March 23, a purchase of 17,000 Ranger shares was credited to Caribou Partners' account. On April 19, this transaction was revised to credit the purchase to Petrobank's account instead. See Chernoff Dep. at 125-26; Chernoff Aff. P 29.

40. On April 3, Thomas A. Budd approached Fred Dyment of Ranger, a prior acquaintance of his, to offer his financial advisory services to Ranger. See Dyment Dep. at 10-12, 98.

41. In response to rumors about a possible tender offer reported by Budd and other sources, Dyment advanced a Ranger board meeting originally scheduled for April 6 to April 5, 2000. See Dyment Dep. at 20-25.

42. On April 6, Dyment received authorization from Ranger to hire Griffiths McBurney--the firm Budd was employed by--as a strategic advisor. See Dyment Dep. 88-90.

43. On April 6, Petrobank and Acquisition formally launched the tender offer, filed the tender offer with the Canadian authorities, and filed a Schedule 14D-1F with the U.S. Securities and Exchange Commission. See Amended Complaint P 21; Gilman Aff., Ex. 1, at 1.

44. At a recorded telephone conference with securities analysts on April 7, 2000, Chernoff stated, "we have been working with a team out of New York to put together this bid." See Gilman Aff., Ex. 5, at 4. At that same conference, Wright stated:

*7 Maybe, uh, maybe we should provide a few answers to questions that are probably percolating through everyone's minds right now.

One of the obvious ones is: "Why did we make our initial investment in Petrobank and why is Petrobank our vehicle?" At Caribou, through our thorough process we concluded that it would, we would probably be most successful if we moved forward some of the opportunities that we've identified through a public vehicle. When we assessed the available opportunities for us to, to invest in a public vehicle we found Petrobank offered a couple of really key elements that we found very appealing.

Id. at 3.

45. On April 13 and 14, Wright and Chernoff met with Ranger shareholders in New York City to discuss the tender offer. See Wright Dep. at 106, 111.

CONCLUSIONS OF LAW

Jurisdiction and Venue Exist

1. This Court has subject matter jurisdiction over the action pursuant to section 27 of the Securities Exchange Act of 1934 (the "Act"), *15 U.S.C. § § 78aa,* as well as *28 U.S.C. § 1331.* Defendants have purchased substantial quantities of Ranger shares, have commenced a tender offer for all outstanding

Case 1:05-cv-00841-JJF    Document 43-2    Filed 12/19/2005    Page 7 of 10

Not Reported in F.Supp.2d                                                                                                                                      Page 6
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
**(Cite as: 2000 WL 33115906 (S.D.N.Y.))**

shares of Ranger, have filed Schedules 13D and 14D-1F with the SEC, and are alleged to have engaged in insider trading in shares of Ranger. Ranger shares are traded on the New York Stock Exchange, and approximately 47% of Ranger shares are held within the United States. Accordingly, the activity abroad has caused a "substantial effect" in the United States, and subject matter jurisdiction exists. See _Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir.1991)_; _Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir.1989)_.

2. This Court has personal jurisdiction over defendants pursuant to section 27 of the Act, _15 U.S.C. § 78aa_. "Since the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment [any] personal jurisdiction challenge ... must be tested against due process standards." _SEC v. Unifund SAL, 910 F.2d 1028, 1033_ (2d Cir.) (citations omitted), reh'g denied, _917 F.2d 98 (2d Cir.1990)_. "Those standards permit the exercise of jurisdiction over a defendant whose 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." ' Id. (quoting _World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980))_. "One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state." Id. In particular, "insider trading ... has serious effects that can reasonably be expected to be visited upon United States shareholders where [a] the securities are those of a ... company traded ... on a United States exchange," and (b) the insider trades occur in the context of a tender offer open to United States shareholders. Id. Therefore, by reason of the same facts cited with respect to subject matter jurisdiction, due process has been satisfied with respect to the exercise of personal jurisdiction over defendants. In addition, although defendants have asserted the affirmative defense that "this Court lacks personal jurisdiction over the Defendants," Answer P 104, they have not raised that defense in the context of this motion. See _GTFM, LLC v. TKN Sales, Inc., 2000 U.S. Dist. LEXIS 4488,_ *1-2 n. 1, No. 00 Civ. 0235, _2000 WL 364871,_ at *1 n. 1 (S.D.N.Y. Apr. 10, 2000).

*8 3. Venue is proper in the Southern District of New York pursuant to section 27 of the Act, _15 U.S.C. § 78aa,_ as well as _28 U.S.C. § 1391_ (b). At the telephone conference with securities analysts on April 7, Chernoff stated, "we have been working with a team out of New York to put together this bid." On April 13 and 14, Wright and Chernoff met with Ranger shareholders in New York City to discuss the tender offer. Because certain of the transactions, acts, practices and courses of business complained of have occurred in the Southern District of New York, venue is proper in this District. See _Bates v. C & S Adjusters, Inc., 980 F.2d 865, 868 (2d Cir.1992)_; _28 U.S.C. § 1391_ (b).

Preliminary Injunction Standard

4. To support the issuance of a preliminary injunction, the moving party must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." _Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979)_ (per curiam); accord _Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir.1999)_; _Consolidated Gold Fields PLC, 871 F.2d at 256_; _Crouse-Hinds Co. v. Internorth, Inc., 634 F.2d 690, 701 (2d Cir.1980)_; _Seaboard World Airlines, Inc. v. Tiger Int'l, Inc., 600 F.2d 355, 359-60 (2d Cir.1979)_.

There is No Showing of Irreparable Harm

5. "[A] showing of irreparable harm [is] the most important prerequisite for the issuance of a preliminary injunction." _NAACP v. Town of East Haven, 70 F.3d 219, 224 (2d Cir.1995)_ (citing _Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir.1990))_. To demonstrate irreparable harm, the "moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." Id. (citing _Reuters Ltd., 903 F .2d at 907)_. Accordingly, a preliminary injunction will not issue if the harm alleged is entirely compensable in monetary damages. See _Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37-38 (2d Cir.1995)_; see also _Iavarone v. Raymond Keyes Assocs., 733 F.Supp. 727, 731-32 (S.D.N.Y.1990)_ (Williams Act § 14(e) violation).

6. Petrobank maintains that--even assuming the purchases of Ranger shares by Caribou Offshore and Caribou Partners constituted insider trading--Ranger has not shown that consummation of the tender offer will give rise to irreparable harm. Any harm occasioned by the alleged purchases by Caribou Partners and Caribou Offshore on the basis of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00841-JJF    Document 43-2    Filed 12/19/2005    Page 8 of 10

Not Reported in F.Supp.2d                                                                                                              Page 7
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
**(Cite as: 2000 WL 33115906 (S.D.N.Y.))**

information given to them by Caribou Capital can be recompensed in the form of money damages, according to defendants. In response, Ranger contends that the irreparable harm is that Ranger shareholders who sold their shares to Caribou Offshore and Caribou Partners have irreparably lost the opportunity to retain their shares in whatever entity Ranger may become as a result of Ranger's future negotiations for a possible friendly takeover as a means of maximizing shareholder value. See Tr. at 65-66.

*9 7. This Court agrees that there has been no showing of irreparable harm. First, any alleged injury is a harm solely to those Ranger shareholders who sold to Caribou Partners and Caribou Offshore and not a harm to Ranger itself. See _Dirks v. SEC, 463 U.S. 646, 672 n. 7, 103 S.Ct. 3255, 3271 n. 7, 77 L.Ed.2d 911 (1983)_ ((Blackmun, J., dissenting) ("Insider trading generally does not injure the corporation itself.") (citations omitted). [FN1]

> FN1. The issue of whether Ranger has standing to bring this action is separate from the question of whether plaintiff has shown irreparable harm. See _Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co., 476 F.2d 687, 696 n. 14 (2d Cir.1973)_ (target has standing pursuant to § 14(e) to seek injunction against tender offer); _Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 944-46 (2d Cir.1969)_ (Friendly, J.) (same); _P. Schoenfeld Asset Management LLC v. Cendant Corp., 47 F.Supp.2d 546, 560 (D.N.J.1999)_ (collecting circuit cases) (same).

8. Second, allegedly aggrieved Ranger shareholders may bring an action for monetary damages to recover the difference in value between the price they received on the sale of the shares to Caribou Capital and Caribou Partners--if indeed there were any insider trading--and the value of the shares if the alleged insider information had been publicly known. See _Ceres Partners v. Gel Assocs., 918 F.2d 349, 352 (2d Cir.1990); Iavarone, 733 F.Supp. at 732; Telex Corp. v. Edelman, 1987 U.S. Dist. LEXIS 13368,_ *9 n .2, No. 87-C-873- E, _1987 WL 43390,_ at *3 & n. 2 (N.D.Okla. Nov. 5, 1987); _John Labatt Ltd. v. Onex Corp., LBT, 890 F.Supp. 235, 248 (S.D.N.Y.1985); Schmidt v. Enertec Corp., 598 F.Supp. 1528, 1544-46 (S.D.N.Y.1984);_ see also _P. Schoenfeld Asset Management LLC, 47 F.Supp.2d at 560_ (collecting circuit cases). In addition, the SEC may bring a civil enforcement action to require disgorgement of any profits gained from the allegedly illicit trades. See _SEC v. Mayhew, 121 F.3d 44, 49 (2d Cir.1997)._

9. "The fact that damages may be 'difficult to quantify' does not necessitate equitable relief." _Iavarone, 733 F.Supp. at 732_ (quoting _Schmidt, 598 F.Supp. at 1544)._

10. _Burlington Indus. v. Edelman, 666 F.Supp. 799_ (M.D.N.C.), aff'd. mem., No. 87-1622(L), _1987 WL 91498_ (4th Cir. June 22, 1987), relied upon by Ranger see Tr at 85, is not to the contrary. That decision involved a tender offer whose legality was "brought into grave question [by] evidence ... that a former executive of the target corporation, who possessed the target's confidential information, act[ed] as a catalyst for and a consultant to a takeover attempt." _666 F.Supp. at 817._ In the present action, by contrast, Ranger alleges not that the Caribou defendants traded on inside information illicitly obtained from Ranger, but rather that Caribou Offshore and Caribou Partners traded on inside information from Caribou Capital about _Caribou Capital's_ plans for a tender offer. The other cases cited by Ranger in its memorandum, see Mem. of Law in Support of Motion at 11-16, are similarly inapposite.

11. Ranger also asserts that irreparable injury will arise because both Ranger and its shareholders will lose the opportunity to participate in the advantageous transactions that Ranger had been negotiating with other potential bidders at the time Petrobank commenced its tender offer. See generally Aff. of Michael B.C. Davies, dated May 5, 2000; Aff. of Fred J. Dyment, dated May 5, 2000; Aff. of John A. Rae, dated May 5, 2000. However, this argument must be rejected. As the U.S. Supreme Court has written:

*10 The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
(Cite as: 2000 WL 33115906 (S.D.N.Y.))

Page 8

Act's draftsmen commented upon the 'extreme care' which was taken 'to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.' S.Rep. No. 550, 90th Cong., 1st Sess., 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess., 4 (1968). U.S.Code Cong. & Admin. News 1968, p. 2811. See also _Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (CA2 1969)_.

_Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58-59, 95 S.Ct. 2069, 2075-76, 45 L.Ed.2d 12 (1975)_ (footnote omitted); accord _ICN Pharms., Inc. v. Khan, 2 F.3d 484, 490-91 (2d Cir.1993)_. In the present case, Ranger management has had opportunity, and has taken full advantage of that opportunity, to express and to explain its opposition to the Petrobank tender offer. See Dyment Aff., Ex. A. The Williams Act requires no more.

12. In a similar vein, the U.S. Court of Appeals for the Second Circuit has explained in Khan:

These policies [articulated in Rondeau] militate against injunctive remedies, such as a permanent ban against a takeover, that go beyond correction of past violations and unduly favor incumbent management. More general restraints upon injunctive relief also suggest a cautious approach. " 'The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." ' _Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir.1969)_ (quoting _Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944))_; see also _Rondeau, 422 U.S. at 60-61, 95 S.Ct. at 2077_; _Thompson v. Edward D. Jones & Co 992 F.2d 187, 189 n. 2 (8th Cir.1993)_ (order enforcing injunction must be narrowly tailored to remedy specific harm shown); _George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1542_ (2d Cir.) (same), cert. denied, _506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992)_.

_Khan, 2 F.3d at 491_. On these grounds, the Second Circuit found in Khan that it would constitute an abuse of discretion to bar the defendant from participating in a future effort to take control of the plaintiff corporation, even if the allegations of defendant's earlier insider trading proved true, since such a broad injunction would "displace the more limited remedies of disenfranchisement or compelled divestiture of the tainted shares." _Id. at 491-92_.

*11 13. In the present action, Ranger similarly seeks preliminary injunctive relief prohibiting the tender offer from proceeding based on insider trading that is alleged to have occurred wholly in the past. Consistent with this Court's findings of fact, the last undisputed purchase of Ranger shares by any of the Caribou defendants took place on February 25. Moreover, Ranger's amended complaint alleges that the last such purchase occurred on March 7, see Amended Complaint P 42(v), and Ranger's papers suggest that the last purchase was on March 23, see Suppl. Mem. in Support of Motion, at 8, over one month before the filing of the present action. Under Kahn, these allegations of wholly past wrongdoing, susceptible to remedy through disgorgement and money damages, are insufficient to support a broad preliminary injunction against the consummation of a takeover. See also _Polaroid Corp. v. Disney, 862 F.2d 987 (3d Cir.1988)_ (no irreparable harm where shareholders wrongfully excluded from tender offer could later sue for damages); _Gearhart Indus., Inc. v. Smith Int'l, Inc., 741 F.2d 707, 716 (5th Cir.1984)_ (no irreparable harm where shareholders who sold their shares under misapprehension created by false filings could sue for damages after tender offer); _Capital Real Estate Investors Tax Exempt Fund Ltd. Partnership v. Schwartzberg, 929 F.Supp. 105, 116 (S.D.N.Y.1996)_ ("The movant must establish a likelihood that future violations will occur.").

14. Finally, Ranger contends that permitting consummation of the tender offer will cause irreparable harm because defendants' failure to disclose the alleged insider trading violations deprives Ranger shareholders of information necessary to assess the trustworthiness of Petrobank's management. According to Ranger, shareholders will therefore be unable to decide properly whether to tender their Ranger shares to Petrobank, with the result that some shareholders who otherwise would not have tendered their shares will in fact do so and the Petrobank management will thus illicitly complete its takeover of Ranger. As a consequence, plaintiff alleges, the present management of Ranger will then be unable to negotiate friendly takeovers that might truly maximize shareholder value. See Tr. at 67.

15. If Ranger were correct, every insider trading violation would also constitute a separate violation of the disclosure requirements of the Williams Act. In addition, any deficiency in Petrobank's disclosure has been ameliorated by Petrobank's inclusion of the entire amended complaint in the Notice of Variation and Extension of the Offer to Purchase filed on May

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00841-JJF   Document 43-2   Filed 12/19/2005   Page 10 of 10

Not Reported in F.Supp.2d                                                                                                   Page 9
Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994
(Cite as: 2000 WL 33115906 (S.D.N.Y.))

11, 2000. See Sher Decl., Ex. 1, at 7 & Ex. B. Moreover, the Notice also sets forth the relationships among the Caribou defendants and each of the disputed purchases of Ranger shares. See Sher Decl., Ex. 1, at 9-13; see also Gilman Aff., Ex. 1, at 52 (disclosure in Schedule 14D-1F filed with SEC on April 6, 2000). Ranger does not contest the accuracy of these disclosures for purposes of the present motion. See Tr. at 29, 33-35. A plaintiff's "allegation that defendants failed to state that they were violating the insider trading laws, where there is no allegation that defendants omitted to disclose a fact, does not state a claim for relief under § 14(e)." *In re PHLCORP Secs. Tender Offer Lit., 700 F.Supp. 1265, 1270 (S.D.N.Y.1988)*.

*12 16. Courts in this district have consistently held in the securities context that when "a genuine and vigorous dispute exists as to whether the material which the plaintiff alleges is required to be disclosed is actually a fact," "the law requires only that the disputed facts and the possible outcomes be disclosed." *Avnet, Inc. v. Scope Indus., 499 F.Supp. 1121, 1125 (S.D.N.Y.1980)*; see *Horsehead Resource Dev. Co. v. B.U.S. Envt'l Servs., Inc., 916 F.Supp. 305, 312 (S.D.N.Y.1996)*, modified, *928 F.Supp. 287, 291 (S.D.N.Y.1996)*; *Kurzweil v. Philip Morris Cos., 1995 U.S. Dist. LEXIS 13030, Nos. 94 Civ. 2373 et al., 1995 WL 540025, at *4 (S.D.N.Y. Sept. 11, 1995)*, vacated, *1997 U.S. Dist. LEXIS 4451, 1997 WL 167043, at *10 (S.D.N.Y. Apr. 9, 1997)* (newly discovered evidence); *Krauth v. Executive Telecard, Ltd., 890 F.Supp. 269, 288 (S.D.N.Y.1995)*; *Lewis v. Potlatch Corp., 716 F.Supp. 807, 810 (S.D.N.Y.1989)*; *In re PHLCORP Secs. Tender Offer Lit., 700 F.Supp. 1265, 1270 (S.D.N.Y.1988)*; *Nemo v. Allen, 466 F.Supp. 192, 195 (S.D.N.Y.1979)*; *Abramson v. Nytronics Inc., 312 F.Supp. 519, 524-26 (S.D.N.Y.1970)*; see also *Telex Corp., 1987 WL 43390, at *4*; *Warner Communications, Inc. v. Murdoch, 581 F.Supp. 1482, 1502 (D.Del.1984)*.

17. Accordingly, Ranger has failed to demonstrate that the continuation of the tender offer in the absence of a preliminary injunction will give rise to irreparable harm.

Laches and Unclean Hands

18. Petrobank asserts the equitable defense of laches based on the delay between its formal commencement of the tender offer on April 6, 2000, and Ranger's filing of the complaint in this action on April 25, 2000. To prove laches, Petrobank would have to demonstrate that Ranger knew of the alleged violations, that Ranger inexcusably delayed in bringing this action, and that Petrobank will be prejudiced by its reliance on the allegedly unreasonable delay. See *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir.1994)*. "The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case." Id. Given the circumstances of the case and the nature of the claims, however, a delay of nineteen days between the start of the tender offer and the start of this action was not unreasonable.

19. Petrobank also raises the equitable defense of unclean hands based on its contention that Ranger hired Thomas Budd with full knowledge that Budd had a conflict of interest due to his prior work for Caribou Capital. "Because a court sitting in equity is a vehicle for affirmatively enforcing the requirements of conscience and good faith, a party who comes into equity must come with clean hands if relief is to be granted." *Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F.Supp.2d 126, 130 (S.D.N.Y.1999)*. However, "the defense of unclean hands applies only with respect to the right in suit." *Warner Bros. Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir.1983)*; see *Gidatex, 82 F.Supp.2d at 131*. In the present case, the hiring of Budd by Ranger is entirely collateral to Ranger's claims against Petrobank and the other defendants.

*13 20. Accordingly, defendants' defenses of laches and unclean hands are without merit in the context of this motion.

CONCLUSION

For the reasons set forth above, plaintiff's motion for a preliminary injunction is hereby denied on the grounds that Ranger has failed to demonstrate irreparable harm.

Not Reported in F.Supp.2d, 2000 WL 33115906 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,994

**Motions, Pleadings and Filings (Back to top)**

• 1:00cv03139 (Docket) (Apr. 25, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.